UNITED STATES of America, Plaintiff,

v.

**AMERICAN TELEPHONE AND TELEGRAPH COMPANY, et al., Defendants.**

**Civ. A. No. 82–0192.**

United States District Court, District of Columbia.

Jan. 9, 1985.

James P. Denvir, Michael F. Altschul, Luin P. Fitch, J. Philip Sauntry, Jr., Antitrust Div., U.S. Dept. of Justice, Washington, D.C., for U.S. Dept. of Justice.

Alfred A. Green, Francine J. Berry, Jim G. Kilpatric, John D. Zeglis, New York City, Lee M. Mitchell, Ben W. Heineman, Jr., Washington, D.C., for American Telephone and Telegraph Co.; Howard J. Trienens, George V. Cook, William L. Keefauver, Sidley & Austin, Washington, D.C., of counsel.

James D. Ellis, John S. Luckstone, Joseph A. Klein, Charles P. Featherstun, Livingston, N.J., for Bell Operating Companies.

R.V.R. Dalenberg, Robert L. Barada, Marion J. Stanton, San Francisco, Cal., for Pacific Bell and Nevada Bell.

J. Roger Wollenberg, Roger M. Whitten, Margaret L. Tobey, Wilmer, Cutler & Pickering, James E. Magee, Washington, D.C., for intervenor GTE Sprint Communications.

Chester T. Kamin, Michael H. Salsbury, Jenner & Block, John R. Worthington, Senior Vice President and General Counsel, MCI Communications Corp., Washington, D.C., for MCI Communications Corp.

Sean A. McCarthy, McLean, Va., for Satellite Business Systems; William E. Willis, Margaret K. Pfeiffer, Robert B. Bell, Sullivan & Cromwell, Washington, D.C., of counsel.

James M. Lyons, Frederick J. Baumann, Rothgerber, Appel & Powers, Denver, Colo., for Utah Public Service Commission.

Neil F. Hartigan, Atty. Gen. of the State of Ill., Hercules F. Bolos, Sp. Asst. Atty. Gen., Chief Counsel—Ill—CC, E. King Poor, Asst. Atty. Gen., Chicago, Ill., for Illinois Commerce Commission.

Stephen G. Oxley, Asst. Secretary and Staff Counsel, Cheyenne, Wyo., for Public Service Commission of Wyoming.

## MEMORANDUM

HAROLD H. GREENE, District Judge.

The issue before the Court is whether AT & T's database system should be made available to the Operating Companies on a temporary basis as a means of enabling other interexchange carriers to operate a sophisticated "800 Service" system.

On July 8, 1983, this Court entered an Order approving the Plan of Reorganization submitted by AT & T and the Department of Justice[1] which implemented the decree in this case.[2] This complex, detailed Plan included a number of provisions concerning post-divestiture provision of so-called "in-WATS" or 800 Service, a unique interexchange service in which the receiver, rather than the originator of the call, subscribes to and is billed for the calls that are made. Insofar as here relevant, the Plan provides that not only AT & T but also the other interexchange carriers and the Operating Companies would be entitled to use the 800 prefix for in-WATS service;[3] that the Operating Companies' Central Staff Organization would administer the North American Numbering Plan, includ-

---

1. *United States v. Western Electric Co.,* 569 F.Supp. 1057, *aff'd sub. nom. California v. United States,* — U.S. —, 104 S.Ct. 542, 78 L.Ed.2d 719 (1983). The Court conditioned its approval of the Plan of Reorganization upon the parties' agreement to certain amendments necessary to correct inconsistencies between the Plan and the decree.

2. *United States v. Western Electric Co.,* 552 F.Supp. 131 (1982), *aff'd. sub nom. Maryland v. United States,* 460 U.S. 1001, 103 S.Ct. 1240, 75 L.Ed.2d 472 (1983).

3. Department of Justice Response to Public Comments on the Plan of Reorganization (March 24, 1983) at 58; Plan of Reorganization, Appendix A, Amendment 33.

ing the assignment of 800 numbers;[4] and that 800 directory assistance would be considered an interexchange, inter-LATA[5] service.[6] The Plan also mandates that AT & T would lease access to its Common Channel Interoffice Signalling (CCIS) system to the Operating Companies "for their provision of intraLATA ... 800 Service ... provided, however, that AT & T will have no obligation to allow [Operating Company] use of CCIS facilities under any arrangement that would allow access directly or indirectly to AT & T's CCIS network ... by other interexchange carriers."[7]

On December 20, 1983, the Department of Justice filed a motion[8] to amend the Plan of Reorganization and to obtain a temporary waiver of the decree's prohibition on the provision of interexchange service by the Operating Companies[9] with respect to 800 Service. The motion would in effect (1) grant to the Operating Companies access to portions of AT & T's CCIS database system for several years (during the period when they developed their own analogous 800 database facilities) for the purpose of sorting and routing the 800 Service calls of interexchange carriers other than AT & T; (2) permit the Operating Companies to provide the interexchange access services necessary for access to the CCIS system; and (3) require AT & T to give to the Operating Companies development assistance and access to the CCIS 800 database in order to facilitate the develop-

ment by the Operating Companies of their own database systems.

The Department's motion is premised upon the proposition that, given the current structure of the 800 Service system, the restriction imposed by the Plan of Reorganization on Operating Company and interexchange carrier access to AT & T's CCIS system is inconsistent with the decree itself[10] because allegedly (1) it conflicts with the requirement of section I(A)(1) of the decree that AT & T shall make available to the Operating Companies "sufficient facilities, personnel, systems, and rights to technical information to permit the [Operating Companies] to perform, independently of AT & T ... exchange access functions;"[11] (2) it prevents the Operating Companies from fulfilling their obligation under section II(B) and Appendix B of the decree to provide equal access to all interexchange carriers with respect to 800 Service;[12] and (3) it will hinder the development of competition in the lucrative[13] 800 Service market, in contravention of the underlying principles of the decree.[14]

## I

800 service, which was commercially introduced by AT & T in 1967, affords businesses and other organizations a means of providing potential customers or others with a ready, free method of contacting them to obtain goods and services.

4. Plan of Reorganization Appendix A, Amendment 33.

5. The acronym "LATA" stands for "Local Access and Transport Area." LATAs are geographic areas within which the Bell Operating Companies are authorized by the Decree to provide exchange telecommunications service.

6. 569 F.Supp. at 1102.

7. Plan of Reorganization at 26 note 36 and Amendment 1.

8. The motion is supported by the Operating Companies and by several interexchange carriers (GTE Sprint, MCI, Western Union, and Satellite Business Systems).

9. Section II(D)(1) of the decree.

10. See section VII of the decree.

11. Department of Justice Memorandum at 2.

12. Department of Justice Reply Brief at 18; Operating Companies' Memorandum at 2–3.

13. According to one of the comments, "800 Service ... is a $2.8 billion interexchange communications service which is growing rapidly." SBS Comment, at 3 (quoting AT & T Communications, October 3, 1983), filed January 13, 1984.

14. As the Court explained in its Opinion approving the decree, the purpose of the decree was to create a truly competitive environment in the telecommunications industry, particularly with respect to interexchange services. 552 F.Supp. at 188.

From 1967 until 1981, 800 Service calls were handled by designated interexchange switching systems called "Originating Screening Offices" and "Terminating Screening Offices". That system worked as follows. An Originating Screening Office encoded the first six digits in the 800 number (800–NXX) into a special three-digit or six-digit routing code that both directed the routing of the call across the interexchange network to the appropriate Terminating Screening Office and identified the service area from which the call originated. The final four digits in the 800 number (XXXX) identified the customer, the end office serving the customer, and the service areas to which the customer had subscribed.[15] The Terminating Screening Office used the special routing code and the last four digits in the 800 number to verify that the call had originated from within a subscribed service area, and to route the call to the local network for completion. Because all of the digits in 800 numbers had significance for screening and routing 800 Service calls, subscribers had no choice of 800 Service numbers, and they were required to change their 800 numbers if they changed their receiving location or required different geographic coverage.

In 1981, AT & T implemented a new, more sophisticated 800 Service routing system that utilized its CCIS system. Under this new system, screening and routing information is not encoded into the 800 number itself. Instead, these functions are performed by Network Control Points, consisting of a computer and related software, that contain 800 Service databases. These Points receive 800 numbers transmitted by the Originating Screening Office, and they screen the numbers to make certain that the call is originating from a subscribed 800 Service area. If the answer is in the affirmative, the Network Control Point reads and translates the 800 Service number to a standard, ten digit "Plain Old Telephone Service" number contained in the database. That number is returned to the Originating Screening Office, which continues to route the 800 Service call across AT & T's interexchange network to the subscriber.

AT & T's use of this new, more sophisticated CCIS database system has enabled it to offer 800 Service subscribers several innovative service options. Since the digits in the 800 number no longer have significance for screening and routing purposes, subscribers are able to obtain 800 Service numbers with verbal significance (*e.g.,* 800–CAR–RENT) that promote product or service identification and presumably increase customer response. The Network Control Points can also be programmed to route 800 Service calls to different destinations at different times of day, or to alleviate call congestion at one subscriber receiving location. Finally, the system's data collection capabilities permit AT & T to offer its 800 Service customers statistical studies concerning the volume of calls received at different times of day from different geographic locations; this information can, of course, assist subscribers in planning their 800 Service operations.

Since both the Operating Companies and the other interexchange carriers at present have neither database 800 number translation systems of their own nor access to AT & T's CCIS database system for interexchange 800 service, these carriers must rely on a modified version of the pre-1981 NXX system.[16] It is this disadvantage

---

**15.** Customers were not required to subscribe to nationwide 800 Service; rather, they could choose to subscribe to such service with respect to limited geographic areas.

**16.** Under the modified NXX system, the NXX prefixes are assigned by the Operating Companies to different interexchange carriers. Exchange carrier switches at the originating Operating Company location are programmed to undertake the six digit translation necessary to route the 800–NXX calls to the proper interexchange carrier, which then provides the interexchange service necessary to complete the call, relying on the subscriber specific XXXX digits.

To the extent that Operating Company switches have not yet been programmed to accomplish the six-digit translation necessary to identify the appropriate interexchange carrier, AT & T has offered to make its Originating Screening offices available for an interim period during which the Bell Operating Companies

which has prompted the Department to file its motion.

## II

Those who support the Department of Justice motion contend that, unless the Operating Companies are enabled to make available to the interexchange carriers AT & T's CCIS database,[17] the decree's equal access requirements[18] will be violated in that the Operating Companies will be able to offer the carriers only an inadequate, inferior 800 Service system that will not permit them to compete effectively with AT & T. In particular, they claim that the following defects exist under the current Plan of Reorganization.

First, under the NXX system, the Operating Companies and the interexchange carriers will be unable to compete with AT & T for those subscribers who desire verbally significant 800 Service numbers; and, in any event, use of the NXX system will require 800 Service subscribers to use different 800 numbers for different interexchange carriers,[19] and for inter-LATA and intra-LATA service.[20] Second, the NXX system establishes economic barriers to the development of effective 800 Service competition, in that the Operating Companies and the interexchange carriers will be required to spend significant sums to make the software modifications necessary to accomplish the screening and routing tasks required for NXX 800 Service.[21] Third, implementation of the NXX system may subject the Operating Companies to liability for failing to provide the non-AT & T interexchange carriers with "equal access" as required under section II(B), III(F), and Appendix B, of the decree.[22]

In essence, the Department of Justice and those supporting its position argue that neither the NXX system nor any other not founded on AT & T's CCIS database would be functionally equal to the AT & T system. While that premise is correct, it does not end the inquiry. The real question here is whether the relegation of the interexchange carriers to the NXX system by the Plan of Reorganization violates the

---

are making the necessary adjustments to their switches. Ohnsorg Affidavit at 10, AT & T Opposition.

**17.** The Operating Companies claim that access to the CCIS database that would be permitted under the proposed amendment is also justified because of the substantial role they played in developing the 800 database system. Operating Companies' Support Memorandum at 16, 17. However, as the Operating Companies recognize, since the effect of granting the present motion would be to facilitate the provision of 800 Service by interexchange carriers who had no part in developing the system, the Operating Companies' argument has force essentially only if a denial of the requested access will subject them to liability for violating the decree's equal access requirements. *Id.* As the Court indicates below, no such violation of the equal access provisions exists here.

**18.** Appendix B of the decree.

**19.** Because the NXX digits will be used to identify the various interexchange carriers, a change in carrier will necessarily result in a change in the NXX portion of the 800 number. Moreover, since the interexchange carriers will use the last four digits (XXXX) of the dialed 800 number for screening and routing purposes, and since it is unlikely that they will use identical coding systems for such functions, a change in interexchange carriers will also result in a change in the last four digits of the 800 number.

**20.** That will be so for any subscriber who does not use inter-LATA and intra-LATA services from the same interexchange carrier, for the NXX digits will be carrier-specific. Thus, if a subscriber uses an interexchange carrier for inter-LATA 800 Service and an Operating Company for intra-LATA 800 Service, the NXX digits in the numbers assigned by the service providers will differ. In addition, the last four digits (XXXX) in the number will also probably differ, for the reasons explained in note 19, *supra.*

**21.** Moreover, it is said, these modifications will become superfluous as soon as the Operating Companies have their own 800 Service databases in place.

**22.** In this regard, it is claimed that the existence of a limited number of NXX prefixes could raise charges that the Operating Companies are discriminating in their assignment of the prefixes, and that, since AT & T's CCIS database system permits it to provide greater services with the 800 numbers forwarded to it by the Operating Companies, these companies could be claimed to be providing AT & T with greater benefits than those enjoyed by the other interexchange carriers.

decree, and does so so clearly that the Plan should be amended long after it was adopted by the parties and approved by the Court. These issues will now be considered.

### III

There is no question but that both the litigants and the public have a strong interest in the finality of judgments, including consent decrees. Finality permits the parties and others to order their present and future conduct on a decree's provisions. Such settled expectations should not be lightly disturbed, except in compelling circumstances similar to those identified in Rule 60(b), Fed.R.Civ.P.,[23] or by courts exercising their residual equity jurisdiction with respect to changed conditions [24] or otherwise.[25] It is also relevant to the inquiry in this particular case that, in its comments on the Plan, the Department of Justice [26] raised no objection of the sort now asserted with regard to the Plan's 800 Service provisions, and that approval of that Plan was preceded by more than a year of adversarial judicial proceedings in which not only the Department but also the Operating Companies, the interexchange carriers, and other interested parties had extensive opportunities to comment.

It is upon the basis of these considerations that AT & T argues that not only would it be unfair for the Court to grant the government's motion and thereby to upset the compromise embodied in the Plan, but that such an action would also improperly prejudice AT & T and constitute an abuse of discretion.[27] Although there is some merit to the AT & T position, there are also substantial countervailing considerations.

The unprecedented scope of this case, which involves the reorganization of the world's largest corporation, coupled with the technical complexity of many of the issues involved in the reorganization, necessarily created a significantly greater possibility of delayed recognition of problems [28] than would be present in the ordinary case.[29] This consideration is enhanced by another, related factor. The technical expertise required for an in-depth

---

**23.** Fed.R.Civ.P. 60(b) provides in relevant part that:

> On motion and upon such terms as are just, the court may relieve a party or his legal representative from a final judgment, order, or proceeding for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b); (3) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party; (4) the judgment is void; (5) the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated or it is no longer equitable that the judgment should have prospective application; or (6) any other reason justifying relief from the operation of the judgment.

**24.** *United States v. Swift & Co.,* 286 U.S. 106, 109, 52 S.Ct. 460, 76 L.Ed. 999 (1932).

**25.** See *EEOC v. Safeway Stores, Inc.,* 611 F.2d 795, 799 (10th Cir.1979).

**26.** See Department of Justice Response to Public Comments on the Plan of Reorganization (March 24, 1983).

**27.** *Arizona v. California,* 460 U.S. 605, 103 S.Ct. 1382, 75 L.Ed.2d 318 (1983); *Ford Motor Co. v. United States,* 335 U.S. 303, 69 S.Ct. 93, 93 L.Ed. 24 (1948); *United States v. Swift & Co.,* 286 U.S. 106, 52 S.Ct. 460, 76 L.Ed. 999 (1932).

**28.** Moreover, as the Court has stated many times, because of the vastness and complexity of the problems, the decree in this case, unlike some other judgments, must be interpreted and enforced not only in accordance with its literal terms but also in conformity with its principal purposes. See generally, *United States v. Western Electric Co.,* 592 F.Supp. 846 (D.D.C.1984).

**29.** The lengthy public review and comment procedure, ordered by the Court in accordance with the requirements of the Antitrust Penalties and Procedures Act (commonly known as the Tunney Act), 15 U.S.C. §§ 16(b)–(h), undoubtedly mitigated this problem somewhat. However, for the reasons discussed *infra,* it cannot be concluded that the public review and comment period could or did totally eliminate the possibility that significant defects would remain undetected.

evaluation of the terms of the Plan was necessarily disproportionately concentrated in the hands of AT & T [30] which drafted the Plan and whose personnel, more than those of any other entity, were intimately familiar with the operations of the Bell System as a whole. It is for reasons such as these that the standards for modification must be more flexible than would ordinarily be true.[31]

The decisions cited by AT & T (see note 27, *supra*) are not directly applicable for yet another reason. All of those cases dealt with decrees, the terms of which were constrained only by applicable law and the court's discretion. Here, by contrast, the parties have proceeded in two stages. The initial decree negotiated by the parties and approved by the Court was, indeed, a carefully crafted compromise. However, the Plan was a subordinate agreement providing for the detailed implementation of the more general principles of the decree, and it was not to be inconsistent with the decree.[32]

■ For these reasons, the Court concludes that it has the power to order modifications to the Plan of Reorganization to remedy inconsistencies between the Plan and the decree. However, in passing upon requests to amend the Plan, the Court does not write on a slate as clean as that which it had before it when the Plan was first submitted for its approval. To put it another way, a party claiming an inconsistency between the decree and the Plan after the Plan has been approved has a substan-

tially higher burden than it would have had prior to such approval. That burden is increased if the issue under consideration is one that was apparent but was not, for whatever reason, addressed before the Plan was finally approved. It is on the basis of this standard that the Court now considers the Department's substantive claims.

## IV

First. It is not seriously disputed that the NXX system, which is functionally similar to the 800 Service system employed by AT & T until 1981, will permit the interexchange carriers to provide an 800 Service with a level of signal quality equivalent to that provided by AT & T. That system will permit up to 583 interexchange carriers to provide the Service to a total of twenty times as many customers as those presently served by AT & T.[33] It is true, of course, that implementation of the NXX plan will require the Operating Companies to acquire increased switching capability to enable them to perform the six-digit translation necessary to sort 800 Service calls and forward them to the appropriate interexchange carrier. However, it appears that such modifications were to have been made by September, 1984, and, in any event, AT & T has offered to make its Originating Screening Offices available to Bell Operating Companies in those situations where modifications have not yet been effected.[34]

---

**30.** To be sure, the Department of Justice had retained its own technical experts, and the intervenors also undoubtedly employed expert personnel. Nevertheless, it does not seem unreasonable to conclude that the AT & T technical staff, who were intimately involved both in the operation of the Bell System and in the preparation of the Plan of Reorganization, had a greater opportunity to familiarize themselves with the many details of the Plan and the technical considerations it involved than anyone else.

**31.** Several of the grounds for modifying a judgment provided by Fed.R.Civ.P. 60(b) would justify such subsequent alterations of the Plan. Given the complexity of that Plan, the Department's failure to identify initially the defects now alleged to exist with respect to 800 Service

could conceivably be characterized as "mistake, inadvertence, surprise, or excusable neglect" (Fed.R.Civ.P. 60(b)(1)), or alternatively as constituting an "other reason justifying relief from the operation of the judgment." Fed.R.Civ.P. 60(b)(6).

**32.** 569 F.Supp. at 1120.

**33.** AT & T Opposition at 21.

**34.** AT & T Opposition, Ohnsorg Affidavit at 10. Because Originating Screening Offices do not exist in every LATA, it is possible that some Operating Companies temporarily relying on the use of an Originating Screening Office will be required to perform inter-LATA communications to contact the closest Originating Screen-

The Court therefore concludes that the NXX system is capable of providing a technologically viable alternative 800 Service system that can be used by the interexchange carriers during the period in which they and the Bell Operating Companies lack their own databases.

Second. An Operating Company will not be in violation of the decree's equal access provisions merely because during an interim period the interexchange carriers will lack AT & T's ability to perform a database translation of an 800 Service number forwarded by such a company. The Operating Companies will be providing to AT & T and to the various interexchange carriers information identical as to type and signal quality—*i.e.*, the dialed 800 number. To be sure, only AT & T currently possesses the technology to perform more advanced 800 Service operations upon the receipt of the 800 number, but this does not alter the fact that the Operating Companies will be providing all interexchange carriers with identical information at an identical quality level. That is what the equal access provisions of the decree require, and that is all they require in this context. These provisions do not require the Operating Companies to employ interexchange access technology possessed by AT & T—or by any other interexchange carrier—to compensate for lack of such capabilities by other interexchange carriers. Indeed, were the Operating Companies to do so, they might conceivably be charged with violating section II(D)(1) of the decree, which prohibits

them from providing interexchange services.[35]

The Department also makes the related point that the Operating Companies' role in assigning NXX prefixes may leave them open to charges that they are discriminating among interexchange carriers. However, this objection is at this time entirely speculative. If the Operating Companies do discriminate in this manner, the problem can adequately be dealt with under the decree's enforcement provisions.[36]

Third. Although it is undoubtedly true that the lack of 800 database technology will force the Operating Companies and the interexchange carriers to incur some expenditures, this does not, by itself, provide a basis for amending the Plan of Reorganization. None of the supporters of the Department's motion has asserted either (1) that the cost of the interexchange carriers of developing their own database (or alternative 800) systems will be prohibitive and thus entirely frustrate entry into the 800 Service field during the interim period (see Part V, *infra*), or (2) that a delay in the availability of competitive interexchange carrier 800 Service during that period will preclude effective 800 Service competition thereafter. The effect of a denial of the government's motion will simply be to require the interexchange carriers to weigh the economic costs and benefits of offering 800 Service at all, or of offering it before or after they or the Operating Companies have developed and deployed their own database systems.[37] No purpose of the de-

---

ing Office. See Department of Justice Memorandum at 13–14. In such cases the Court will entertain specific requests for temporary waivers of the decree's prohibition on Operating Company provision of interexchange services for the purpose of providing 800 Service only, and only until such time as the petitioning company has (1) developed its own six-digit translation capability or (2) implemented its own database system.

**35.** For that reason, the Department's proposed amendment to the Plan of Reorganization might violate the terms of the decree. As both AT & T (AT & T Reply at 19–20) and several of the other interexchange carriers (see, *e.g.*, Sprint at 7)

have observed, that amendment to the Plan would raise the danger that the Operating Companies could use the capacity, information, and functions they acquired as a consequence of the amendment improperly to provide interexchange services.

**36.** See sections §§ VII, VIII(I) of the decree.

**37.** Thus, to the extent that the use of the interim NXX plan would require the interexchange carriers to make investments in equipment or software that would become superfluous within two or three years, it will be up to them to determine whether it is commercially desirable to incur such costs.

cree will be frustrated if the interexchange carriers must undertake such cost-benefit analyses. .

Indeed, such cost-benefit analysis by the interexchange carriers in deciding whether, where, when, and how to offer various sorts of interexchange service is precisely what is contemplated by the decree. As the Court indicated when it rejected the argument that the Plan of Reorganization should be amended to provide that 800 Service directory assistance should be assigned to the Operating Companies (thereby affording the interexchange carriers access to this information), it is not the purpose of the decree either to punish AT & T or to compensate for the interexchange carriers' economic and technological deficiencies of the interexchange carriers by granting them free access to AT & T technology, equipment, and information.[38] The theory of the decree is that equal access will permit various interexchange carriers to compete as they choose in the interexchange markets by developing their own technology and marketing strategy, with the public benefitting from the resulting technological innovation and choice of services. The purpose of the decree in this regard is thus a limited one: to remove barriers to entry and to create a truly competitive environment for interexchange services. It is not the artificial creation of competition by enabling the interexchange carriers to share AT & T's interexchange capabilities and facilities to which they are not otherwise entitled. If the interexchange carriers wish to fulfill the decree's promise of flourishing interexchange competition, it will be up to them to make the necessary financial investments and to develop the appropriate technology.

## V

In any event, the database plan proposed by the Department of Justice constitutes a problematic alternative. To begin with, as noted above, that plan may itself be in some conflict with the decree by permitting the Operating Companies to provide interexchange services.[39]

The Department's proposal is also flawed on broader grounds. Given the present capabilities of the Operating Companies and of the AT & T CCIS system, it appears that, at least initially, only three interexchange carriers in addition to AT & T could provide 800 Service using that system.[40] Thus, at least in the short run, that proposal will hardly provide equal access in the sense that all interexchange carriers will be able to compete on an equal basis with AT & T.[41]

Moreover, even if the system could be modified to accommodate more interexchange carriers, as the Department and the Operating Companies contend, the necessity for such modifications raises significant problems of timing and enforcement. If, as is asserted, the Operating Companies are able to develop their own database sys-

---

**38.** See 569 F.Supp. at 1102.

**39.** See note 35, *supra.*

**40.** Bell Operating Companies' Reply at 26; AT & T Reply at 21.

**41.** Indeed, it should be noted in this regard that the interexchange carriers and the Operating Companies disagree over the method that should be used to select the three additional interexchange carriers. GTE Sprint proposes an assertedly neutral test based on the competing interexchange carriers' existing areas of geographic coverage (GTE Sprint Comment at 2). However, this test would likely favor more established interexchange carriers at the expense of less established ones, a result hardly consistent with any reasonable notion of equal access. A truly random selection scheme such as that suggested by the Operating Companies (Reply at 26) might be more consistent with the equal access requirement, but it might fail to select viable competitors to AT & T, or to select interexchange carriers who provide 800 Service of broad geographic scope, with the result that meaningful competition with AT & T would not be established. Possibly a workable third selection scheme, combining elements of these two, could be developed. Nevertheless, the foregoing discussion establishes the essential point: any selection scheme runs the dual risks of being unworkable from the standpoint of providing effective competition for AT & T or of violating the equal access requirement.

tems within two years,[42] thereby at that point mooting the entire 800 Service controversy, it makes little practical sense to require the adoption of a plan which by any measure cannot itself be fully implemented until shortly before the time when it will become irrelevant. The Operating Companies believe that the modifications necessary for implementation of the Department of Justice plan could be made within a year (Bell Operating Companies' Reply at 26 n. 14), while AT & T contends that such modifications would take considerably longer. (AT & T Opposition, Ohnsorg Affidavit at 2.)[43] Either way, the current problem is clearly only an interim one.

The relatively short time period during which the database plan would be operational also raises significant problems of enforcement: inasmuch as the necessary modifications of the equipment and the software to provide access to the CCIS system to entities other than AT & T would be under AT & T's control, the question whether these modifications were being implemented as rapidly and as effectively as possible would necessarily be largely subjective.[44] Given that fundamental fact, it would be difficult for the interested parties to raise, and for the Court to decide, motions to compel compliance sufficiently quickly for the entire process to be of significant practical value.

█ In sum, numerous considerations of policy and practicality militate against granting the Department's motion with respect to the use by the Operating Companies of AT & T's CCIS facilities, and that portion of the government's motion is accordingly denied.

**42.** Operating Company Reply, Handler Affidavit at 8.

**43.** As the government aptly observes, "it is not clear that the disagreement can be resolved on the basis of the filings made to date." Reply Brief at 26.

**44.** See Department of Justice Reply Brief at 24–26; see also note 43, *supra.*

## VI

As the foregoing discussion indicates, the asserted ability of the Operating Companies to deploy their own database system within a relatively brief period of time constitutes a factor in the Court's decision to deny the major portion of the Department's motion. The Operating Companies claim that to enable them to effect such deployment in the most effective manner, AT & T should be required to furnish them the existing 800 database source codes and related documentation and, temporarily, with "seed personnel."[45]

Under the Plan of Reorganization, the Operating Companies are given the rights to "obtain from Western Electric CCIS, STP and NCP hardware and software, including 'know how' and existing applications software associated with related operations systems, for the provision of any services they are authorized to provide under the Decree."[46] This provision does not, in terms or in purpose, require AT & T to provide the Operating Companies with existing source codes and related documentation for its CCIS 800 database system. Moreover, as far as an amendment of the Plan to require AT & T to provide the Operating Companies with such information is concerned, it would be inappropriate for the reasons elaborated above. The Operating Companies are entitled under the Plan to obtain from AT & T the hardware, software, and know-how necessary to develop their own database systems; they are not entitled to replicate AT & T's existing system by simple use of AT & T's database.

What the Plan envisions is that the Operating Companies, once provided with the necessary equipment and know-how, will

**45.** Operating Companies' Support Memorandum at 24. The Department of Justice, while not explicitly taking a position as to what the Plan presently requires, has moved to amend the Plan so as to reflect the Operating Companies' understanding with respect to the source codes and related documentation. Department of Justice Motion at 2.

**46.** Plan of Reorganization at 26 note 36.

develop their own database system—a system which may be similar to AT & T's or which may be different. This approach is not only consistent with the language of the Plan; it is also consistent with the decree's goal of establishing the Operating Companies as entities that are truly independent of AT & T.[47] Accordingly, the motion is denied with respect to the provision of source codes and related documentation.[48] However, AT & T shall furnish to the Operating Companies, upon their request, the hardware, software, and know-how necessary for the development of their own database system and, if the Operating Companies experience problems in that regard they, or others, may return to the Court for appropriate relief.

Finally, as noted, the Operating Companies also request the assignment of AT & T "seed personnel." Under the terms of the Plan provision cited above, AT & T is obligated to provide the Operating Companies with the know-how required to develop their own databases. Most of this know-how will presumably consist of technical papers and other training materials, but it is conceivable that some of this information can effectively be made available only by means of the temporary assignment of "seed personnel." However, it would be inappropriate to order the temporary assignment of such personnel absent a motion based upon a clear showing that the assignment is necessary to effectuate the terms of the Plan. No such motion has been filed and no such showing has been made, and the Operating Companies' request is therefore denied.

---

47. *United States v. AT & T,* 552 F.Supp. at 226–230.

48. The denial of the Department's motion to modify the plan is warranted not only the merits, but also because the Department has failed to carry its "substantially higher burden" of establishing the necessity for the proposed change. See Part III, *supra.*