UNITED STATES of America, Plaintiff,

v.

WESTERN ELECTRIC COMPANY, INC., et al., Defendants.

Civ. A. No. 82–0192 (HHG).

United States District Court, District of Columbia.

July 13, 1990.

See also 131 F.R.D. 645.

---

648

Barry Grossman, Chief, Nancy C. Garrison, Asst. Chief, Michael F. Altschul, Luin P. Fitch, Jr., Communications and Finance Section, Antitrust Div., U.S. Dept. of Justice, Washington, D.C., for plaintiff.

John D. Zeglis, Francine J. Berry, Mark C. Rosenblum, Basking Ridge, N.J., Robert D. McLean, Jr., Washington, D.C., (Howard J. Trienens, David W. Carpenter, Sidley & Austin, Chicago, Ill., of counsel), for AT & T.

Thomas P. Hester, Lawrence E. Strickling, Alan N. Baker, Ameritech, Chicago, Ill., Alfred Winchell Whittacker, Kirkland & Ellis, Washington, D.C., for Ameritech.

James R. Young, John M. Goodman, James G. Pachulski, Washington, D.C., (Robert A. Levetown, of counsel), for Bell Atlantic.

Walter H. Alford, Mark D. Hallenbeck, Michael J. Schwarz, Atlanta, Ga., (J. Robert Fitzgerald, Robert W. O'Neill, of counsel), for BellSouth.

Saul Fisher, Mary McDermott, Katherine S. Abrams, White Plains, N.Y., Martin J. Silverman, Washington, D.C. (Raymond F. Burke, of counsel), for NYNEX.

Stanley J. Moore, Washington, D.C., Richard W. Odgers, Randall E. Cape, Theresa L. Cabral, San Francisco, Cal., for Pacific Telesis.

Martin E. Grambow, Liam S. Coonan, Washington, D.C., James D. Ellis, Liam S. Coonan, Paul G. Lane, Mark P. Royer, James E. Taylor, William C. Sullivan, Linda S. Legg, St. Louis, Mo., for Southwestern Bell.

Jeffrey S. Bork, Washington, D.C., George Ann Harding, Stuart S. Gunckel, David S. Sather, Denver, Colo., for US West.

Roy L. Morris, Deputy Gen. Counsel, Washington, D.C., for ALC Communications Corp.

Chester T. Kamin, Michael H. Salsbury, Anthony C. Epstein, Glenn B. Manishin, Carl S. Nadler, John T. Nakahata, John S. di Bene, Jenner & Block, and John R. Worthington, Sr. Vice President and Gen. Counsel, MCI Communications Corp., Washington, D.C., for MCI.

Martin T. McCue, Vice President and Gen. Counsel, U.S. Telephone Ass'n, Washington, D.C., for U.S. Telephone Ass'n.

W. Theodore Pierson, Jr., James M. Smith, Reed Smith Shaw & McClay including Pierson, Ball & Dowd (Helen M. Pohlig, Gen. Counsel, Competitive Telecommunications Ass'n, of counsel), Washington, D.C., for Competitive Telecommunications Ass'n.

Martin E. Freidel, Gen. Counsel, MidAmerican Long Distance Co., Omaha, Neb., for MidAmerican Long Distance Co.

Randall B. Lowe, Sherry F. Bellamy, Douglas L. Povich, Jones, Day, Reavis & Pogue, Washington, D.C., for Teleconnect Long Distance Services and Systems Co.

Leon M. Kestenbaum, H. Richard Juhnke, Washington, D.C., for US Sprint Communications Co. Ltd. Partnership.

## MEMORANDUM

HAROLD H. GREENE, District Judge.

US West, one of the Regional Companies, has filed a motion for a declaratory ruling, or in the alternative, for a waiver of the decree restrictions, to permit it to provide common channel signaling intercon-

nection on a centralized basis in lieu of installing the requisite interconnection in every LATA. The other Regional Companies not only support the US West request, but each of them asks for similar treatment on its own behalf. AT & T and MCI, on the other hand, oppose the motion, while the Department of Justice and several other interested parties, including some of the smaller interexchange carriers, oppose the declaratory judgment part of the motion but support the requests for waivers.

## I

■ The requests for a declaratory judgment present little difficulty; it is plain under the decree that it must be denied. Signaling is and always has been an integral part of telecommunications traffic, including interexchange traffic. Moreover, each inter-LATA communication must include information with its signaling that dictates, in addition to the destination of the called party, the interexchange carrier selected to reach that party. On this basis, the decree specifically includes the "provision of network control signaling" in the definition of exchange access—a function which under the decree is to be performed by the Regional Companies. Section IV(F) of the decree.[1]

It is equally clear from the language of the decree that the Regional Companies are required to deliver exchange access traffic to the interexchange carriers at points of presence (POP) in every LATA. Section

IV(F) explicitly directs that the exchange access services "shall be provided by facilities in [a LATA]" for the "delivery of and receipt of [interexchange traffic] at a point or points within the [LATA] designated by an interexchange carrier." And in its Opinion approving the AT & T plan of reorganization, the Court explained, once again, that the Regional Companies must "deliver traffic originating or terminating within a LATA to a point of presence (POP) within the LATA." *United States v. Western Electric Co.*, 569 F.Supp. 990, 994 and n. 13 (D.D.C.1983), *aff'd*, 464 U.S. 1013, 104 S.Ct. 542, 78 L.Ed.2d 719 (1983).

Surprisingly, in view of the Regional Companies' general opposition to decree construction based on purpose where the language of the decree is unambiguous,[2] US West and the other Regional Companies argue, in effect, that the Court should disregard the decree language and instead focus on what they term its core objectives,[3] such as the public interest in an upgrade of the long distance networks and the cost and quality of telephone service.[4] These public interest factors, too, are considerations which the Regional Companies have vehemently argued in other contexts, and with some success, to be irrelevant. Thus, the Court of Appeals recently explained at the urging of the Regional Companies and the Department of Justice that, in construing the decree, this Court was not to consider such objectives as universal telephone service and hence the cost of such service to consumers.[5]

---

1. US West concedes that the delivery of signaling to the interexchange carriers is an exchange access service, Motion at 9, and so does the Department of Justice. Memorandum at 2.

2. *See, e.g.,* Joint Reply Brief of Regional Companies in Court of Appeals Nos. 87–5388 et al. at 12 n. 5. However, as this Court has had occasion to note several times, when it suits their business plans the Regional Companies have not been shy to rise above principle and to advocate judicial reliance on decree purpose. *See, e.g., United States v. Western Electric Co.,* 673 F.Supp. 525, 585 n. 269. Emerson has said that a foolish consistency is the hobgoblin of little minds (*Essays: First Series* (18.41))—a criticism that could not legitimately be levelled at the Regional Companies.

3. The Department of Justice likewise abandons its recent insistence on obedience to literal decree language, advocating that the Court ignore that language in this instance. Department of Justice Memorandum at 2.

4. *See, e.g.,* US West Memorandum at 8–9; NYNEX Comments at 10–11; Bell Atlantic Reply at 3–7.

5. *See, e.g., United States v. Western Electric Co.,* 900 F.2d 283, 299–300 (D.C.Cir.1990). That is not to say that on the subject here under consideration the purposes of the decree and its language are not in agreement, for they are. This is a subject the Court explores below in its discussion of the requests for waivers.

In any event, whatever these inconsistencies, what is altogether plain is that the decree language stands as a categorical obstacle to the Regional Companies' declaratory judgment requests.

## II

■ Now as to the waiver. The Regional Companies and the Department of Justice explain that common channel signaling and Signaling System 7 (SS7–CCS), which is planned to be deployed this year or next,[6] uses a data network separate from the communications channel for transmission of network control signaling information, rather than transmitting that information over the channel used for the communication itself. The waivers should be granted, according to those supporting them, because it is now feasible to separate the signaling channels from those used for the transmission of the communications themselves, and because the installation of interfaces in just a few central points would be less expensive for the Regional Companies than the provision of the equipment in every LATA as the decree requires. *See, e.g.,* Department of Justice Memorandum at 7, 16–19; Ameritech Memorandum at 11; Bell Atlantic Reply at 3–4; Pacific Telesis Reply at 3–4; Southwestern Bell Comments at 18–20. The proponents of the waivers further argue that adherence to the decree would provide no advantage to the public. Department of Justice Memorandum at 19.

In the first place, it is most doubtful that the Court would be justified in light of recent appellate decisions to ignore the language of the decree in order to provide to the Regional Companies the collateral benefit of a savings of a relatively small amount of money.[7] Cost alone has never been regarded as a reason for deviating from the requirements of the decree. Divestiture was a costly process, and the costs involved were deemed justified in order to create a competitive market structure of benefit to consumers, to innovation, and to an American telecommunications industry spurred to optimum performance by the traditional disciplining tool of a capitalist economy—competition. Furthermore, the Regional Companies are hardly in a position to complain of the cost of complying with the divestiture decree: as a consequence of that decree, each of them inherited thriving businesses and many billions of dollars in assets.

## III

Beyond that, the grant of waivers would adversely affect long distance competition. Signaling information is vital to such competition: network control signaling can be used by a company engaged in interexchange services to distinguish itself from its competitors in such areas as better network architecture, improved billing, new and unique services, faster call set-up, and more efficient operation in other areas. And since the CCS network is a data network it can also be used to provide data and information services to end users.

Thus, if the Regional Companies were permitted to engage in this obvious interexchange function and thereby to decide whether, where, when, and how to offer interexchange services, they would become the arbiters of interexchange services, and

---

6. According to the Department of Justice, some of the Regional Companies are planning to make SS7 interconnection available beginning "perhaps as early as mid–1990, or in early 1991." *See* Memorandum at 6 and n. 10. US West plans on interconnection of the Regional Company CCS networks in the fall of 1990. US West Reply at 12.

7. As has been pointed out, the cost to US West, for example, of delivering service in each LATA as the decree requires will, by its estimate, be $60 million initially and $6 million annually. MCI Opposition at 12. However, this amount constitutes only .0085 of the $7 billion US West has invested in its network since divestiture. *Id.* at 13. As MCI also correctly notes, "the proposition that the Regional Companies cannot afford to spend $60 million to comply with the judgment strains credulity in light of the billions of dollars Regional Companies already have invested, and continue to invest, in their exchange networks and in various unrelated businesses." *Id.* at 12. Moreover, not only does the $60 million figure appear to be inflated but, whatever the actual cost, it is likely to be recovered through local rates and access charges. *Id.* at 16.

they could shape the competition in that field to suit their interests or even to frustrate it altogether.[8]

These factors have particular significance by virtue of the fact that each of the Regional Companies is deploying the same type of inter-LATA signaling network for which all of them now seek approval, and the companies are planning to interconnect their SS7 networks to create a nationwide Regional Company signaling system.[9] It also appears that these companies intend to offer revenue producing services (such as call completion to busy numbers on an inter-LATA basis) which represent the initial steps for commercial applications of signaling as a commodity.[10]

Almost since the date of the divestiture in 1984, the Regional Companies have consistently worked for, and expected that, notwithstanding the decree and the fact that there has been no significant change since the decree was entered, they would somehow be able to enter the interexchange business.[11] These companies have also, again almost from the first day, attempted to build upon the slightest concession from the Court as a springboard for claimed entitlements for further advances into prohibited lines of business. This Court has, on a number of occasions commented on this "slippery slope" syndrome. *See, e.g., United States v. Western Electric Co.,* 673 F.Supp. 525, 545 (D.D.C.1987), *rev'd on other grounds,* 900 F.2d 283 (D.C. Cir.1990). Moreover, the expectation of future competition with the interexchange carriers has always represented an incentive for present Regional Company discrimination. *See United States v. Western*

*Electric Co.,* 592 F.Supp. 846, 867–68 (D.D. C.1984), *appeal dismissed,* 777 F.2d 23 (D.C.Cir.1985).

Not only is it likely that the grant of the current motions would lead to discrimination against the interexchange carriers, the anticipated competitors of the Regional Companies, but such discrimination has already taken place. Thus, the companies apparently plan to implement SS7 for their own data base services first, and accordingly they have delayed interexchange company testing that would permit these companies to position themselves in the same market. MCI Opposition at 19. Further, Regional Company centralized SS7 architecture will substantially degrade the quality of access available to the interexchange carriers, increasing call set-up time for each 800 call by as much as 4.2 seconds. MCI Opposition at 20 n. 38.

It was the rationale of the decree, as it is the rationale of the antitrust laws, that the public will benefit from free competition, unfettered by monopolists. There is no question but that a waiver here, if granted, would injure the public, even as a grant of that waiver would save the Regional Companies some money.

## IV

The Regional Companies respond that strict adherence to the decree will primarily benefit AT & T and MCI and may disadvantage the smaller interexchange carriers.[12] *See, e.g.,* US West Reply at 9–11; Ameritech Memorandum at 10, 13–14; Bell Atlantic Reply at 7–8; BellSouth Motion at 14–15. The newly-founded solicitude of the

---

**8.** *See United States v. Western Electric Co.,* 583 F.Supp. 1257, 1259 (D.D.C.1984); 604 F.Supp. 316, 324 (D.D.C.1985).

**9.** *See* letters from E.J. Morea, NYNEX Material Enterprises to R. Santoro, MCI, of October 17, 1988, and letter from D. King, BellSouth Services to M. Van Zetta, MCI, dated September 7, 1988, cited in MCI's Opposition at 17 n. 32.

**10.** There is no basis whatever for the claim that such commercial messages are "official" communications since they are being offered on a

commercial, competitive basis. *See United States v. Western Electric Co., Inc.,* Civil Action No. 82–0192, 1989 WL 21992 (D.D.C. January 24, 1989), slip op. at 10–11.

**11.** For the most recent manifestation, *see* Joint Brief for the Regional Telephone Company Appellants in Nos. 87–5388 et al.—*United States v. Western Electric Co.,* April 17, 1989, at 13–14.

**12.** Some of the smaller interexchange carriers make the same argument. *See* Teleconnect Response at 7–8; MidAmerican Response at 4.

Regional Companies for the smaller inter-exchange carriers is certainly touching; however, it cannot erase the long-established principle,[13] recently relied on by the Court of Appeals [14] that the antitrust laws in general and the decree in this case in particular are designed to benefit competition, not particular competitors.

## V

Waivers under Section VIII(C) from the restrictions mandated by the decree are to be granted upon a showing by a Regional Company that "there is no substantial possibility that it could use its monopoly power to impede competition in the market it seeks to enter." *See United States v. Western Electric Co., Inc.*, 592 F.Supp. 846, 851 (D.D.C.1984); *United States v. Western Electric Co.*, 900 F.2d 283, 291, 295–300 (D.C.Cir.1990). For the reasons stated, it is the Court's conclusion that such showing has not been made but that, in addition to being offensive to the decree language, such waivers would be inconsistent with its purposes and would create a substantial possibility that the Regional Companies could use their monopoly power to impede competition in the market they seek to enter.

The motions are therefore hereby denied.

**13.** *See Brown Shoe Co. v. United States*, 370 U.S. 294, 320, 82 S.Ct. 1502, 1521, 8 L.Ed.2d 510 (1962).

**14.** *See* 900 F.2d at 296. The Regional Companies, too, have relied on this principle many times. Thus, in the peroration of their Joint Reply Brief in the Court of Appeals, these companies argue that, by refusing to permit them to enter the lines of business prohibited to them by the decree, this Court has been engaged in the "ultimate antitrust fallacy of protecting competitors, not competition." Joint Reply Brief in No. 87–5388 et al., *United States v. Western Electric Co., Inc.*