969 F.2d 1231
 297 U.S.App.D.C. 231, 1992-2 Trade Cases P 69,905
 UNITED STATES of America
v.
WESTERN ELECTRIC COMPANY, INC., et al. Bell Atlantic
Corporation, Appellant.
UNITED STATES of America
v.
WESTERN ELECTRIC COMPANY, INC., et al. US West, Inc., Appellant.
UNITED STATES of America
v.
WESTERN ELECTRIC COMPANY, INC., et al. Ameritech, Appellant.
UNITED STATES of America
v.
WESTERN ELECTRIC COMPANY, INC., et al. Pacific Telesis
Group, Appellant.
UNITED STATES of America
v.
WESTERN ELECTRIC COMPANY, INC., et al. BellSouth
Corporation, Appellant.
UNITED STATES of America
v.
WESTERN ELECTRIC COMPANY, INC., et al. Southwestern Bell
Corporation, Appellant.
UNITED STATES of America
v.
WESTERN ELECTRIC COMPANY, INC., and American Telephone and
Telegraph Company NYNEX Corporation, Appellant.
 Nos. 90-5333, 90-5335, 90-5337, 90-5351, 90-5365, 90-5367
and 90-5373.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Jan. 21, 1992.
Decided July 24, 1992.
 
 Stephen M. Shapiro, with whom Mark I. Levy and Michael K. Kellogg, for Bell Companies, John Thorne, Michael D. Lowe, and Michael E. Glover, for Bell Atlantic Corp., Jeffrey S. Bork, for US WEST, Inc., Richard W. Odgers, Margaret DeB. Brown, and Stanley J. Moore, for Pacific Telesis Group, Walter H. Alford and Mark D. Hallenbeck, for BellSouth Corp., Liam S. Coonan, Ann Meuleman, and Martin E. Grambow, for Southwestern Bell Corp., and Raymond F. Burke, for NYNEX Corp., were on the joint brief, for Bell Co. appellants in all cases.
 Nancy C. Garrison, Atty., Dept. of Justice, with whom James F. Rill, Asst. Atty. Gen., and Catherine G. O'Sullivan, Atty., were on the brief, for Federal appellee in all cases.
 David W. Carpenter, with whom Mark C. Rosenblum and Howard J. Trienens, were on the brief, for appellee American Tel. & Tel. Co. in all cases.
 Michael H. Salsbury, with whom Chester T. Kamin and Carl S. Nadler, were on the brief, for appellee MCI Communications Corp. in all cases. Anthony C. Epstein also entered an appearance, for appellee.
 Martin T. McCue entered an appearance, for appellee U.S. Tel. Ass'n in all cases.
 Gail L. Polivy entered an appearance, for appellee GTE Corp. in all cases.
 John E. Ingle, Deputy Associate Gen. Counsel, and Robert L. Pettit, Gen. Counsel, filed a statement, for amicus curiae F.C.C. in 90-5333, explaining an FCC order.
 Before: SILBERMAN, WILLIAMS, and SENTELLE, Circuit Judges.
 Opinion for the Court filed by Circuit Judge SILBERMAN.
 Dissenting Opinion filed by Circuit Judge STEPHEN F. WILLIAMS.
 SILBERMAN, Circuit Judge:
 
 
 1
 The seven regional Bell Operating Companies (BOCs or Companies) and the United States appeal from the district court's denial of a waiver of the AT & T consent decree to permit centralized provision of the "signaling" component of long distance telephone calls. The appellants[1] maintain that their motion for a waiver should not be evaluated under the standard set forth in section VIII(C) of the decree--whether the proposal presents no substantial possibility of impeding competition--but rather under section VII and the more permissive [297 U.S.App.D.C. 233] test for unopposed decree modifications that we applied to the information services portion of the Triennial Review case: whether the requested waiver would be certain to lessen competition. See United States v. Western Elec. Co., 900 F.2d 283, 308 (D.C.Cir.) (Triennial Review Opinion ), cert. denied, --- U.S. ----, 111 S.Ct. 283, 112 L.Ed.2d 238 (1990).
 
 
 2
 We think that the section VIII(C) standard applies and that the BOCs failed to demonstrate that their proposal satisfied that standard. We therefore affirm the judgment of the district court.
 
 I.
 
 3
 The 1982 consent decree settled the government's antitrust suit against the "Bell System" by first separating the BOCs[2] and their monopolies over local telephone ("exchange") service from AT & T and its more competitive long distance ("interexchange") and equipment manufacturing businesses and then--with section II(D)'s "line-of-business" restrictions--prohibiting the BOCs from reentering those and other competitive markets. See generally United States v. American Tel. & Tel. Co., 552 F.Supp. 131 (D.D.C.1982) (Decree Opinion), aff'd mem. sub nom. Maryland v. United States, 460 U.S. 1001, 103 S.Ct. 1240, 75 L.Ed.2d 472 (1983); United States v. Western Elec. Co., 569 F.Supp. 1057 (D.D.C.) (Reorganization Opinion), aff'd mem. sub nom. California v. United States, 464 U.S. 1013, 104 S.Ct. 542, 78 L.Ed.2d 719 (1983).
 
 
 4
 Section II(D)(1) of the decree, which prohibits the BOCs from providing any "interexchange telecommunications services," was implemented, and the scope of the seven BOCs' local monopolies defined, by dividing the country geographically into 164 "exchange areas" (better known as "LATAs").[3] See generally United States v. Western Elec. Co., 569 F.Supp. 990 (D.D.C.1983) (LATA Opinion ). Each local operating company (see note 2) encompasses several LATAs but is nevertheless allowed to transmit telecommunications information only between points within a single LATA, providing what is, basically, the traditional local telephone service. When a person in one LATA calls a person in another, the BOC serving the caller's LATA must transmit the call to an interexchange carrier, such as AT & T or MCI, which then carries the call on its own network across the LATA boundaries, where it is picked up by the BOC serving the called party's LATA. (If the caller and called party live in different LATAs within one Company's region, the same Company both passes and picks up the interexchange call.) Section II(A) of the decree obliges the BOCs to provide such "exchange access" services to all interexchange carriers, and section IV(F) requires them to do so "at a point or points within [a LATA] designated by [the] interexchange carrier."[4] These "points of presence" in each LATA are thus the locations where the telecommunications networks of the seven Companies and the numerous interexchange carriers interconnect. [297 U.S.App.D.C. 234] See LATA Opinion, 569 F.Supp. at 994 n. 13.
 
 
 5
 The telephone "call" that a Company passes to an interexchange carrier consists of two components. One is the actual communication (e.g., the voices) of the calling and called parties. The other is "network control signaling," which directs the operation of the telecommunications network, telling the switches and circuits how and when to set up and disconnect a call. The signaling indicates that a receiver has been picked up, what digits were dialed, whether the called line is ringing or busy, when the phone is hung up, and so forth. When the decree was approved in 1982, almost all signaling was "in-band," meaning that the communication and its associated network control signals were transmitted over the same circuit and therefore delivered to the interexchange carrier at the same location--the carrier's point of presence in each LATA. In-band signaling, however, has significant limitations. Because the signals travel over the same circuit as the callers' communication, they must precede or follow the communication. In-band signaling is also relatively slow and can carry relatively little information.
 
 
 6
 In recent years a new signaling technology has emerged. In "out-of-band" or Common Channel Signaling (CCS), the signals are transmitted over a system of switches and circuits separate from that of the communications they control. The CCS and communications networks are not parallel but rather linked only at special CCS switches known as Signal Transfer Points (STPs). Out-of-band signaling is much more efficient than in-band. The CCS network contains only signals, which can be packeted into bursts of information and loaded into a circuit with no gaps; in contrast, a single voice communication takes up an entire circuit, even when the parties are not saying anything. As a result, a single CCS circuit can carry the signaling for over 10,000 calls. Each STP pair, moreover, can be connected to multiple communications switches, allowing a few STP pairs to serve a very large area.
 
 
 7
 The advantages of CCS are undisputed. Its speed markedly reduces call set-up time--the time between dialing on one end and ringing on the other--a benefit of particular value to long distance service. It also frees circuits for communications by not clogging them while callers listen to busy signals or service announcements. And it provides the technological foundation for a variety of new telecommunications services, including some for which the signaling functions as part or all of the communicated information. For example, CCS enables the telephone number of the calling party to be transmitted to the called party, allowing such caller identification features as distinctive ringing and selective call screening, call waiting, and call forwarding.
 
 
 8
 The BOCs have begun to deploy CCS networks for use in providing local (intra-LATA) exchange services. The CCS efficiencies and network structure have allowed the Companies to deploy centralized STP pairs, each pair having the capacity to serve several of a Company's LATAs.[5] US WEST's STP pair in Minneapolis, for example, serves U S WEST switches in six of its LATAs. In 1989, in fact, the BOCs predicted that all 164 LATAs could be served by only 27 STP pairs, although many more pairs have been installed in the last three years. The interexchange carriers have also been deploying CCS networks for use in their interexchange systems. AT & T inherited the Bell System's nascent CCS network at divestiture, and MCI has also extended signaling facilities to almost every LATA. The smaller carriers have lagged somewhat behind.
 
 
 9
 This case is brought because the BOCs have not yet installed an STP pair in every LATA and wish to avoid having to do so just to allow the interexchange carriers to connect in every LATA. Instead, they would like authority to provide the carriers access to CCS service only at certain centralized [297 U.S.App.D.C. 235] locations. Under their proposal, in other words, there would not be a section IV(B) point of presence--at least for this service--in every LATA. The BOCs maintain that meeting the section IV(B) requirement for CCS would be expensive and inefficient for both them and the interexchange carriers, particularly the smaller ones. It is claimed that not all LATAs (especially in less populated areas) have sufficient call volume to cost-justify their own STP and that the smaller carriers also could not afford construction of a CCS link to an STP in every LATA. AT & T and MCI, on the other hand, with significant investment in CCS systems more extensive than their smaller competitors, want interconnections in every LATA so as to benefit from those investments.
 
 
 10
 In February 1989 US WEST filed a motion in the district court requesting a waiver "of the Decree" to allow centralized signaling interfaces. (Under its proposal, the communications component of interexchange calls would still be provided at the point of presence in each LATA, as would in-band signaling if the carrier so requested.) US WEST purported to act "pursuant to section VII of the Decree," a provision that authorizes the district court to modify the decree upon application of any party.[6] Section VII does not include any criterion for judging proposed changes, so motions under it are presumed to be governed by the appropriate common law standard. See Triennial Review Opinion, 900 F.2d at 305-07. Changes uncontested by any party to the decree are granted if "within the reaches of the public interest," id. at 306 (quotation marks omitted)--that is, unless they are "certain to lessen competition," id. at 308.[7]
 
 
 11
 The positions of the decree parties in this case were divided. The other six BOCs supported US WEST's motion and filed similar motions of their own.[8] The Department of Justice (DOJ) told the Companies to file directly in the district court, claiming that the motions did not involve a modification of the line-of-business provisions and so the DOJ pre-screening procedure, see United States v. Western Elec. Co., 592 F.Supp. 846, 873-74 (D.D.C.1984), appeal dismissed, 777 F.2d 23 (D.C.Cir.1985), was inapplicable. The DOJ then filed a "memorandum" supporting the CCS waiver request.
 
 
 12
 However, the remaining party to the decree, AT & T, opposed the Companies' motions, arguing that section IV(F) of the decree expressly obliges the Companies to provide access to network control signaling in every LATA and that the centralization of signaling would allow the BOCs to transmit telecommunications information--the signals--across LATA boundaries in violation of the section II(D)(1) interexchange services ban. AT & T argued that the proposal should therefore be evaluated not under section VII but under the decree's other provision for modification, section VIII(C).[9] That section was added to [297 U.S.App.D.C. 236] the decree to establish an explicit standard governing a particularly important type of modification: contested changes in the decree's core line-of-business restrictions.[10] See Triennial Review Opinion, 900 F.2d at 291. Section VIII(C) requires a BOC seeking to waive or remove a section II(D) restriction to demonstrate that "there is no substantial possibility that it could use its monopoly power [in the local exchange market] to impede competition in the market it seeks to enter." The Companies' blanket, nationwide waiver proposal, AT & T asserted, could not satisfy that test, and the BOCs were unwilling to limit their request to transitional waivers for the particular LATAs for which a specific showing of low call volume and inefficiency of STP and CCS link installation might be made. MCI, intervening, essentially joined AT & T in these arguments.
 
 
 13
 The district court, shortly after our Triennial Review Opinion issued, held that the waiver proposal did not satisfy the section VIII(C) test. See United States v. Western Elec. Co., 131 F.R.D. 647, 650-52 (D.D.C.1990) (Waiver Opinion ), reconsideration denied, Civ. No. 82-0192 (D.D.C. Sept. 6, 1990) (Reconsideration Opinion ). The BOCs and the Department of Justice appeal.
 
 II.
 
 14
 The dispute between the parties has two main facets. The Companies and the Justice Department contend that the waiver request does not substantially implicate the decree's line-of-business restrictions and therefore that the standard to determine whether it should be granted is not the potentially demanding section VIII(C) test but rather the more relaxed public interest test embodied in section VII. Alternatively, the appellants maintain that the applicability of section VIII(C) turns on the position of the DOJ--the plaintiff and "Prime Mover" in the antitrust case underlying the decree. Even if section VIII(C) would apply had the government contested the CCS waiver, the argument goes, section VII and the public interest test govern here because the DOJ does support the proposal. AT & T's opposition to a modification of a line-of-business restriction, the appellants claim, has no more significance than that of other, non-party interexchange carriers.
 
 
 15
 The first argument is based on the notion that the centralization of signaling interfaces involves primarily not an entry into the interexchange services market prohibited by section II(D)(1) but rather a redefinition of the Companies' obligation under section IV(F) to provide network control signaling in each LATA. The appellants assert that a small adjustment in the definition of the BOCs' exchange access monopoly is distinguishable from an "entry" into a new and competitive line of business, even though the CCS waiver might "affect" the interexchange market.[11] We think that is a distinction without a difference. By that logic, the decree's most sensitive restriction placed on the Companies might be eroded merely by redefining the decree's terms. The Companies could, for example, just as well move to redefine "interexchange telecommunications"" [297 U.S.App.D.C. 237] as transmission of information from one Company's region to another's, rather than from one LATA to another, vastly expanding the Companies' monopolies. It is therefore plain to us that the CCS waiver would not merely change the details of existing exchange access service, but would allow the BOCs to expand their monopolies over exchange access into a slice of the competitive interexchange services market--maybe a narrow slice, involving (for now) only the transmission of traditional network control signaling between the LATAs in each Company's region, but a slice nevertheless. Therefore, a modification that requires a change in a line-of-business restriction is, if contested, governed by the section VIII(C) test.
 
 
 16
 The more serious argument, that the relaxed section VII public interest standard governs waivers supported by the DOJ whether or not opposed by AT & T--i.e., if the DOJ approves a waiver, it is not "contested"--is largely a product of a footnote in our Triennial Review Opinion. See 900 F.2d at 294 n. 12. We affirmed, in that case, the district court's refusal to lift the decree's ban on the BOCs' manufacturing of telephone equipment, see id. at 301-04, but reversed a similar refusal to allow the Companies to provide information services, see id. at 305-09. We drew a distinction between proposed modifications of the line-of-business restrictions that were unopposed by the other two parties to the decree (the government and AT & T), and waivers contested by either or both of them. The latter were governed by the section VIII(C) standard, whereas uncontested proposals were to be judged by the more lenient "within the reaches of the public interest" standard. See id. at 305-07.
 
 
 17
 We also noted that the decree contemplated that only the Companies could petition under section VIII(C) for modification of the line-of-business restrictions. See id. at 294-95. Therefore, if the DOJ wanted an alteration of those restrictions it would necessarily proceed under section VII, the provision authorizing any party to seek decree modifications. See id. at 294. We then added a footnote raising a question as to what standard would apply to such a motion:
 
 
 18
 The Government opposed the modification sought in Swift, and therefore it is not at all clear to us that the stringent, so-called "unforeseen conditions" test of Swift would apply to motions brought by the DOJ under section VII. Since the DOJ is, as plaintiff, the "Prime Mover" of this case, it may well be that modifications it seeks should be evaluated under a standard somewhat more akin to the "public interest" test of the Tunney Act. Still, it is true that the line of business restrictions were part of what AT & T bargained for in the original decree, therefore suggesting that the modification requests that AT & T opposes should perhaps be viewed differently from those that all the parties agree to. We need not pass on this issue here since the DOJ brought no motion under section VII.
 
 
 19
 Id. at 294 n. 12 (emphasis in original deleted; new emphasis added).
 
 
 20
 Appellants, relying exclusively on the italicized portion of the footnote, assert that by asking the question of what standard applied, we answered it--that we have strongly implied that the government's support for a waiver causes the public interest test to govern. That is a strained interpretation at best, since we have clearly indicated that if AT & T opposes a line-of-business modification, then DOJ's support, in whatever form, does not relieve the Companies from meeting the section VIII(C) test. Thus, in the Triennial Review Opinion itself we treated the BOCs' motion to remove the manufacturing line-of-business restriction as contested and subject to the section VIII(C) standard notwithstanding DOJ's support for the proposal. See id. at 301. And in the subsequent NYNEX Procurement Opinion (United States v. Western Elec. Co., 907 F.2d 1205 (D.C.Cir.1990)), where it was the Justice Department that formally moved for a waiver of a section II(D) restriction, we said that the Department "bears the same burden that [the BOC] would" and remanded for the district court to determine [297 U.S.App.D.C. 238] whether AT & T had properly opposed the waiver. See id. at 1207-09 & n. 3.
 
 
 21
 Appellants nevertheless, and for the first time in this series of cases, squarely challenge the proposition that AT & T's opposition to a proposed change should have such important consequences as to trigger the more stringent section VIII(C) standard. They argue that AT & T's "rights" under the decree are unaffected by changes in the line-of-business restrictions on the BOCs, and therefore that AT & T's "legal or equitable status" in relation to the CCS waiver should be thought no different than any other interexchange carrier's-- i.e., not significant enough to affect the standard by which we evaluate the proposal. See Triennial Review Opinion, 900 F.2d at 292, 305-07 (opposition by non-party intervenors does not make the information services modification "contested" and subject to the section VIII(C) test). Appellants point in particular to the Justice Department's role as the "principal proponent" of the line-of-business restrictions, Decree Opinion, 552 F.Supp. at 186 n. 227, and to AT & T's professed neutrality or opposition to those restrictions during the decree negotiations. As those provisions were not part of the "bargain" AT & T sought, we are told, AT & T's opposition to their alteration now should be deemed legally inconsequential.
 
 
 22
 It is, however, those line-of-business restrictions that prevent the Companies from a full-bore entry into the interexchange market. It seems more than passing strange to suggest that the decree should be interpreted so as not to allow AT & T to contest, under section VIII(C), the BOCs' complete entry into the interexchange market. After all, the AT & T lawsuit was based on the premise that a corporation that enjoyed a monopoly on local calls would ineluctably leverage that bottleneck control in the interexchange (long distance) market. See id. at 142, 188-89. The Bell System was for that reason broken up; the local monopolies were taken away from AT & T. (Of course, "AT & T" is a different entity after the decree than it was before.) To claim that AT & T has no interest under the decree in challenging one or more of the Company's "return" to the interexchange market, there to compete against AT & T with the same sort of local monopoly leverage that caused the government to bring suit against AT & T in the first place, has an ironic, even Kafkaesque, quality. By the appellants' logic, if the BOCs' proposed entry into the interexchange market was likely to impede competition (which would violate the section VIII(C) test) but not certain to do so (thus surviving section VII's public interest test), and if the government did not object, the district judge would be obliged to permit the entry. Are we to believe that AT & T had in 1982, and has today, no interest in effectively objecting to such a proposal?
 
 
 23
 The dissent responds to our question in the negative. Judge Williams argues that AT & T has no institutional interest in competition in the interexchange market, and thus to read the decree to allow AT & T to object to any sort of BOC entry into that market--including a complete and full-scale entry--is to sanction a broad "allocation" of telecommunications markets in contradiction to the purpose of the antitrust laws. Dissent at 1243-44. That argument, which has the virtue of boldly confronting the core problem with appellants' case (even if it is an argument that neither appellants nor the government dare make), is nothing less than an attack on the very premise of the consent decree. AT & T today, after all, has the same economic interest vis-a-vis the BOCs' effort to gain access to the interexchange market that MCI (the company that first sought to compete against the Bell System in the interexchange market) had at the time the government's lawsuit was brought against the Bell System. MCI then, and both AT & T and MCI now, seek to confine the BOCs to that portion of the telecommunications market in which they enjoy a historical natural monopoly.
 
 
 24
 Certainly there is nothing in the language of the decree that suggests that AT & T should be thought unconcerned with the line-of-business restrictions, so that it should be regarded as not a "real" party with respect to those matters. It is not, as [297 U.S.App.D.C. 239] our dissenting colleague puts it, that we "assume[ ] that just because the Department of Justice and AT & T are parties to the same contract, and both have interests in the line-of-business restrictions (one acting for the public, the other for its shareholders), it follows that they must have identical rights in relation to those restrictions." Dissent at 1245. To the contrary, section III treats AT & T as a formal party to the entire decree,[12] with specific authority under section VII to demand enforcement of any section of the agreement. Indeed, in a 1987 filing in the district court, the government stated that AT & T "ha[s] the right to seek enforcement [of a line-of-business restriction] ... itself at any time," citing section VII.[13] Nor have we been shown any precedent applying a variable standard to judge a suggested modification of general language of a decree, depending on which party objects.[14]
 
 
 25
 Appellants have, nevertheless, combed the multitude of documents filed and hearing transcripts generated during the decree approval proceedings and have found numerous examples of Bell System representatives (who now work for AT & T) professing opposition to the line-of-business restrictions or acceptance of them simply as a step towards an overall settlement. Appellees in turn point to some statements demonstrating more affirmative interest in the prohibitions. But what are we to make of these offerings? After all, the Bell System (pre-divestiture AT & T) had been defending itself for decades--and presumably would have continued defending itself if the settlement negotiations failed--on the ground that vertical integration of telecommunications businesses is efficient and pro-competitive. The Bell System representatives also faced a significant inherent conflict of interest: post-divestiture AT & T, as an interexchange carrier and equipment manufacturer, would obviously favor a complete prohibition on competition from the powerful local monopolies, while the post-divestiture BOCs would undoubtedly desire no such restrictions. The Bell System's duty at the time was, of course, to maximize the combined future value of AT & T and the BOCs for its (and soon to be their) shareholders. See United States v. Western Elec. Co., 797 F.2d 1082, 1088 (D.C.Cir.1986), cert. denied, 480 U.S. 922, 107 S.Ct. 1384, 94 L.Ed.2d 698 (1987). Perhaps to satisfy that obligation perfectly was psychologically impossible, but we presume that the negotiators fulfilled their duty and thus that the decree, and especially the section II(D) prohibitions at its core, represents a balanced amalgamation of benefits to and burdens upon both AT & T and the BOCs. For that reason, we think recourse to the decree's bargaining history to interpret how those who were negotiating for the unified Bell System saw the benefits and burdens distributed between post-divestiture AT & T and the BOCs is of [297 U.S.App.D.C. 240] little use today. Cf. Triennial Review Opinion, 900 F.2d at 293 (decree negotiating history may be useful in other contexts).[15]
 
 
 26
 The Justice Department, although it does not go so far as our dissenting colleague in challenging the consent decree as an anti-competitive division of the telecommunications industry, does caution that we should not "interpret" the decree to give AT & T a "strong incentive to oppose pro-competitive decree modifications in order to protect itself from the very competition such modifications could promote." This contention is, as the dissent elaborates, sort of a variation on the antitrust injury doctrine. See, e.g., Cargill, Inc. v. Monfort of Colorado, Inc., 479 U.S. 104, 109-13, 107 S.Ct. 484, 488-91, 93 L.Ed.2d 427 (1986). But if, as the dissent suggests, AT & T should not be thought to have "antitrust standing" to assert its apparent rights under the decree because the BOCs' entry into the interexchange market would come at AT & T's expense, Dissent at 1247-48, then it follows that MCI should not have had standing to file suit, see MCI Communications Corp. v. American Tel. & Tel. Co., 708 F.2d 1081 (7th Cir.), cert. denied, 464 U.S. 891, 104 S.Ct. 234, 78 L.Ed.2d 226 (1983), or to complain to the Justice Department, concerning the Bell System's activities in the interexchange market in the first place. That AT & T is now the largest carrier in the interexchange market hardly immunizes it against antitrust injury from new competitors who are monopolists in the local exchange markets. The flaw in our colleague's reasoning, we respectfully suggest, is that he entirely ignores the potential anti-competitive leverage that the BOCs' monopoly position in the bottleneck local markets affords their entry into the interexchange markets.[16]
 
 
 27
 Insofar as the government believes that there are pro-competitive aspects of a BOC's proposed "reentry" into part or all of the interexchange market, it can aid the BOC in seeking to meet the section VIII(C) test by showing that the proposal will enhance rather than impede competition. The government expresses particular concern that AT & T might somehow use its rights under section VIII(C) to handicap its existing interexchange competitors by making it more difficult for the BOCs to provide services to those competitors in the interexchange market. We note, however, that AT & T's fiercest competitor, MCI, supports AT & T's construction of the decree, and that although the BOCs claim that AT & T's smaller competitors would benefit from both the CCS proposal and their construction of the decree, none of those companies appeared before us. It should be remembered that section VIII(C) does not give AT & T the power to veto truly pro-competitive line-of-business modifications, only to block those changes that are quite possibly, though not certainly, anti-competitive.
 
 
 28
 In any event, as MCI observes, the question before us is not how we would fashion the decree if we were writing on a clean slate. The decree is not ambiguous; it gives AT & T the right, as a party to the decree, to assert its objection to the BOCs' proposal and thus to invoke section VIII(C). Until this case, the government never even suggested that the decree could be read otherwise.
 
 
 29
 [297 U.S.App.D.C. 241] We are thus persuaded by AT & T's argument that the CCS waiver must be judged according to section VIII(C)'s standard, for whenever a modification implicates the line-of-business restrictions and is contested by any of the parties to the decree, the section VIII(C) test governs.[17] Even if we had doubts, however, we think our prior decisions in the Triennial Review and NYNEX Procurement cases would deter us from accepting appellants' argument. It may be, as the BOCs contend, that the premise we here reaffirm--that AT & T's opposition makes a line-of-business modification "undeniably 'contested,' " Triennial Review Opinion, 900 F.2d at 292, regardless of the government's position--was not forcefully argued in those cases. The BOCs did assert to the district court in Triennial that AT & T had no interest under the decree in the line-of-business restrictions. On appeal, the Companies referenced that argument but emphasized the converse point--that AT & T's acquiescence in the removal of the information services ban left that proposal uncontested (notwithstanding the opposition of other interexchange carriers that were not decree parties). We were, therefore, clearly focused on the significance of AT & T's position, and but for AT & T's opposition, we would have reversed and remanded the manufacturing portion of Triennial just as we did the information services portion. Indeed, in discussing the latter proposal, we explained that "[f]or purposes of identifying the proper standard of review, the critical point is that neither AT & T nor the DOJ opposed the ... motion." Id. at 305 n. 27 (emphasis omitted). And in the NYNEX Procurement Opinion we again viewed AT & T's position as pivotal, directing the district court on remand to apply the section VIII(C) standard if AT & T had properly contested the (government-supported) waiver. See 907 F.2d at 1209.
 
 
 30
 The proposition that AT & T's position on a proposed line-of-business modification can be determinative of whether the section VIII(C) test applies has thus been a linchpin of two of our opinions. Although it is true that we cannot be said to have held that AT & T's opposition makes a requested modification contested--because the point was not directly controverted--we do not think that the Companies can opportunistically, after so much litigation involving the same parties, switch their position and challenge that proposition at this late date. Cf. Northwestern Ind. Tele. Co. v. FCC, 872 F.2d 465, 470 (D.C.Cir.1989), cert. denied, 493 U.S. 1035, 110 S.Ct. 757, 107 L.Ed.2d 773 (1990); Laffey v. Northwest Airlines, Inc., 740 F.2d 1071, 1089-90 (D.C.Cir.1984) (per curiam).
 
 III.
 
 31
 The appellants' submissions to the district court were not clearly focused on the section VIII(c) test--that is, on demonstrating that the CCS waiver posed no substantial possibility of impeding competition in the interexchange services market. Nor are their appellate briefs primarily directed to this point. We are rather disappointed, particularly in light of our remarks in the Triennial Review Opinion as to the importance of the DOJ's predictive economic analysis, see 900 F.2d at 297-98; accord NYNEX Procurement Opinion, 907 F.2d at 1209, that the Department's market analysis in this case was so perfunctory. See Reconsideration Opinion, Mem. at 2. Based on the existing record, we do not see how the district judge's conclusion that the Companies' proposed waiver does not meet the section VIII(C) test, see Waiver Opinion, 131 F.R.D. at 652, can be thought erroneous. See Triennial Review Opinion, 900 F.2d at 293-94 (discussing standard of review in section VIII(C) cases).
 
 
 32
 In the Triennial Review Opinion, we determined that the BOCs cannot "impede competition," as that phrase is used in section VIII(C), unless they will possess market power--the ability to restrict output and/or raise prices--in the market they seek to enter via the proposed decree modification. See 900 F.2d at 296. Although [297 U.S.App.D.C. 242] neither the parties nor the district court performed a detailed market definition, it appears, as we have noted, see supra note 11, that the CCS waiver would allow the BOCs to enter the interexchange services market.[18] The district court determined that by transmitting network control signals across LATA boundaries, the BOCs would "adversely affect" a "vital" aspect of existing interexchange competition: interexchange carriers can, and apparently do, compete on the basis of being able to provide over the widest area the superior "network architecture, improved billing, new and unique services, faster call set-up," and other advantages of CCS signaling. Waiver Opinion, 131 F.R.D. at 650; see also Reconsideration Opinion, Mem. at 2. The submissions of the DOJ and Ameritech (in a filing signed by the Companies' appellate counsel) also conceded that signaling can be used in differentiating interexchange service.
 
 
 33
 The BOCs contend, however, that they merely want to offer an existing exchange access service--the provision of network control signaling--in a very similar (same content and ultimate destination, different interconnection point) but much more efficient manner. This would not "impede competition" in any meaningful way, they claim, because they would still lack market power in the interexchange services market as a whole. There would be no control over output, it is asserted, because the decree requires the Companies to provide signaling with every interexchange call, however many there are. As for price, appellants suggest that the cost of interexchange calls would in fact decline because the Companies would not be required to install and operate expensive and unnecessary STP pairs in every LATA (and will pass on the savings as lower access charges), nor would interexchange carriers have to invest in CCS links to every LATA. Appellees and the district court simply failed to confront, appellants argue, this absence of market power. Section VIII(C), however, places the burden of proof on the BOCs, see NYNEX Procurement Opinion, 907 F.2d at 1208; Triennial Review Opinion, 900 F.2d at 304, and we think that they (even with the DOJ's assistance) have not carried that burden.
 
 
 34
 In our previous cases, the BOCs sought to enter all or part of a section II(D) market in order to compete with the companies already in that market. See, e.g., NYNEX Procurement Opinion, 907 F.2d at 1209 (observing that NYNEX wanted to compete with the thousands of firms already in the telecommunications equipment distribution market). Here, by contrast, the BOCs hope to take a piece of the interexchange market completely out of competition. If the CCS waiver is granted, the Companies' putative "competitors"--the interexchange carriers that currently provide inter-LATA signaling services--will be able to obtain CCS signaling only at centralized points, at whatever access charge the Companies demand (subject, as are the Companies' other monopoly services, to government regulation).[19] And the slice of interexchange competition foreclosed, even if narrow today, could prove difficult to confine. See Waiver Opinion, 131 F.R.D. at 651; see also Triennial Review Opinion, 900 F.2d at 309 n. 29 (noting concern over "the practical difficulty of enforcing a merely partial repeal of [a section II(D) ] ban" (emphasis in original)).
 
 
 35
 Appellants claim that any reduction in interexchange services competition will be insignificant because many small interexchange carriers cannot afford to install CCS links to every LATA, leaving only AT & T and perhaps a couple of other carriers offering CCS services to those areas[297 U.S.App.D.C. 243] which is hardly the basis for vigorous competition. To the extent that appellants contend that the decree should be interpreted to aid the minnows against the trout, such as AT & T and MCI (effectively devaluing the investments those companies have made in extending their CCS networks to more LATAs), they are simply wrong. See Waiver Opinion, 131 F.R.D. at 652 (citing Triennial Review Opinion, 900 F.2d at 296). To the extent that appellants argue that without centralized STPs no competition over interexchange CCS signaling will exist in some LATAs, their position is undercut by their insistence on a blanket, nationwide waiver rather than transitional waivers for only those particular LATAs--waivers that AT & T has stated it would not oppose and that we too would be likely to view sympathetically, see Gateway Opinion, 907 F.2d at 164-65; see also LATA Opinion, 569 F.Supp. at 996 n. 27, 1004 n. 62 (noting that LATAs were intended to be large enough to cost-justify service by several interexchange carriers and not just AT & T).
 
 
 36
 We are quite skeptical, moreover, about the principal benefit claimed by the appellants--the costs that the BOCs could avoid if the CCS waiver were granted--because even if the savings were large,[20] they might be entirely irrelevant to the section VIII(C) analysis. Savings passed on to the Companies' local ratepayers (or shareholders) would not provide any competitive benefit to the market the Companies seek to enter. See Triennial Review Opinion, 900 F.2d at 296. Only if the savings were passed on to the interexchange carriers (and then to their customers) would prices for interexchange calls be affected. Appellants have not demonstrated that any savings from the CCS waiver would necessarily (or even likely) result in lower (or even stable) access charges.
 
 
 37
 * * * * * *
 
 
 38
 Perhaps a stronger case can be made than that which the appellants mounted, but on this record the judgment of the district court is affirmed.
 
 
 39
 It is so ordered.
 
 
 40
 STEPHEN F. WILLIAMS, Circuit Judge, dissenting:
 
 
 41
 The 1982 consent decree resolving the Department of Justice's protracted antitrust suit against the Bell System included so-called "line of business" restrictions. See Section II(D) of the decree. United States v. American Tel. & Tel. Co., 552 F.Supp. 131 (D.D.C.1982), decree published, id. at 226-34. These bar each of the Bell Operating Companies (the "BOCs") from entering specified sections of the telecommunications industry. Hitherto, so far as I know, Section II(D) has not been recognized as a market-allocation agreement between the separate firms into which the Bell System was split--new AT & T (which I call simply AT & T, referring to the pre-decree entity as the Bell System) and the BOCs. The court's present decision gives Section II(D) that effect.
 
 
 42
 Narrowly conceived, the issue is which of three possible standards established by our decision in United States v. Western Elec. Co., 900 F.2d 283, 305-07 (D.C.Cir.1990) ("Triennial Review "), should govern a request by the BOCs to relax the line of business restrictions when the United States Department of Justice, sole plaintiff in the original antitrust suit, favors the change: (A) For "uncontested" modifications, the "public interest" standard of the Tunney Act (15 U.S.C. § 16(b)-(h) (1988)) controls, calling for approval if the change is "within the reaches of the public interest". See Maj.Op. at 1239. (B) For "contested" modifications there are two alternatives. Changes in the BOC "line of business" restrictions are governed by Section VIII(C), requiring the applying BOC to [297 U.S.App.D.C. 244] show that there is "no substantial possibility that it could use its monopoly power to impede competition in the market it seeks to enter"; other contested changes are governed by United States v. Swift & Co., 286 U.S. 106, 119, 52 S.Ct. 460, 464, 76 L.Ed. 999 (1932), requiring "a clear showing of grievous wrong evoked by new and unforeseen conditions". As the proposed changes are in the definition sections that give meaning to Section II(D)'s "line of business" provisions, the real choice here is between the "public interest" standard and Section VIII(C). See Maj.Op. at 1236-37. Under Triennial Review, Section VIII(C) controls only if the change is "contested" within the meaning of that opinion.
 
 
 43
 The majority here rules that AT & T's opposition is enough of a "contest" to make a line-of-business change "contested" even when the Department of Justice approves. Thus the rump of the original defendant, a firm that has no institutional interest in favoring competition in interexchange markets, simply by crying nyet can displace the standard normally governing changes that are not contested by the original plaintiff. While it is of course true that the "line of business" restrictions originated in the Justice Department's belief that they were necessary to facilitate competition, the Department believes that the modifications here proposed "would promote interexchange competition". Brief of United States at 38. The upshot is that restraints originally devised in the name of enhancing competition have now become a private anti-competition agreement between potential competitors (AT & T and the BOCs), to be cheerfully enforced by the courts at the behest of a private party that (naturally) resists intrusion on its turf.
 
 
 44
 * * *
 
 
 45
 The starting place for any possible AT & T entitlement to shift the applicable standard is obviously the agreement itself. The only material language--apart from the substantive provisions themselves--is in Section VII:
 
 Retention of Jurisdiction
 
 46
 Jurisdiction is retained by this Court for the purpose of enabling any of the parties to this Modification of Final Judgment, or, after the reorganization specified in section I, a BOC to apply to this Court at any time for such further orders or directions as may be necessary or appropriate for the construction or carrying out of this Modification of Final Judgment, for the modification of any of the provisions hereof, for the enforcement of compliance herewith, and for the punishment of any violation hereof.
 
 
 47
 It is evident from the heading of this provision and its first six words that it was inserted to ensure that the district court would have jurisdiction over all disputes arising under the decree. It thus rejected the usual rule that the court of the original decree has no special position as to such disputes, Washington Hospital v. White, 889 F.2d 1294, 1299 (3d Cir.1989), doubtless to achieve litigation economies for all participants. The balance of the sentence is aimed at assuring that all disputes arising under the decree could end up in the district court, and not just some. Thus the provision does not address the narrow issue of whether AT & T was to be considered "a formal party to the entire decree", Maj.Op. at 1238 (emphasis in original), or (if it were) what specific rights AT & T thereby secured.
 
 
 48
 Nor is Section III of any help: "The Provisions of this [decree] applicable to each defendant, shall be binding upon said defendants and BOCs, their affiliates, successors and assigns...." The section is carefully phrased to make sure that the burdens imposed on then-present entities--and only those burdens--should reach any later components or offspring of the burdened firms. It says nothing about who is allowed to enforce any specific element of the decree. Compare Maj.Op. at 1238-39 & n. 12.
 
 
 49
 Some parts of the decree directly burden AT & T, such as Section I(D), barring post-divestiture AT & T acquisition of stock or assets of any of the BOCs. Some parts provide AT & T with clear entitlements, such as Section VIII(G)'s rule on how to resolve conflicts over the allocation of assetsused [297 U.S.App.D.C. 245] before divestiture by both AT & T and a BOC, and Section II(B)'s ban on BOCs' discriminating between AT & T and others. (While doubtless arising out of concern about pro-AT & T discrimination, it is phrased so as to run both ways and no reason appears why it should not.) The substance of these burdens and benefits is such that we may safely infer that the parties intended that AT & T would be a party to their enforcement in every sense of the word. For these, AT & T's role as party scarcely depends on Section VII.
 
 
 50
 The logic of the line-of-business restrictions is quite different. They originated, as the majority correctly notes, Maj.Op. at 1238, in the Justice Department's belief that the Bell System had used its local service monopoly to achieve market power in adjacent fields and its concern that the BOCs would do likewise. As such, the restrictions seek, perhaps ironically, to enhance competition by restricting competitive entry. Obviously such a device is rather delicate, even in the hands of the Justice Department or courts, as competitive values are on both sides of the issue. But as an agreement between private firms, the line-of-business restrictions of Section II(D) are simply an agreement of potential competitors to divide the market--i.e., a per se violation of the Sherman Act, see United States v. Topco Associates, Inc., 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972). We should be slow to give the section a role in such obvious tension with the purposes of the antitrust laws. Nothing in Section VII justifies our doing so.[1]
 
 
 51
 Of course the Department of Justice might conceivably have put its imprimatur on an agreement by which Bell divided itself and provided that all of the new firms would have contractual rights against competitive threats from each other. As the text of the decree suggests no such purpose, one might find it in the structure of the relations of the parties, and I gather that is the majority's purpose in its discussion of the Bell System's pre-break-up goals. Maj.Op. at 1239. As the majority correctly observes, before divestiture the Bell management's duty and, presumably, intention were to maximize the System's value; with divestiture in prospect, this meant maximizing the combined value of the future AT & T and of the BOCs. See id. at 1239. The majority apparently assumes that that must have entailed supporting enforcement power for AT & T, for it concludes that as it "presume[s] that the negotiators fulfilled their duty", there is no need to look at what was actually said about future AT & T's rights in the restrictions. Id.
 
 
 52
 In fact, however, there is no special reason to believe that the Bell System management would have been likely to think that the future AT & T's gain from any increment in restrictions would be enough to offset the BOCs' loss. Equally so for post-decree modifications; if the Bell management expected that relaxations would on a net basis decrease the value of the aggregate, it would have tried to give the future AT & T the special hold over VIII(C) changes that the court here finds; otherwise not. Either result is theoretically possible, depending on the relative abilities of the different Bell components to exploit the competitive advantages they enjoy in their own markets. But without detailed information about those advantages, there is nothing inherent in the pre-divorce structure of the Bell System that gives us a reason to impute to it a desire to secure such a special position for AT & T.
 
 
 53
 In one respect, the majority's view is in obvious contradiction with the structure of the Bell System as divestiture approached. Under the majority's view that the language of Section VII unambiguously gives AT & T rights to enforce and preserve the line-of-business rules, its reading must sweep in the BOCs as well. Thus each BOC is entitled to insist on the Section VIII(C) standard as to a line-of-business change sought by any other BOC, such as [297 U.S.App.D.C. 246] Ameritech's seeking some relaxation of restrictions that would enlarge the scope of its competition with NYNEX. But it is hard to see how such veto proliferation could be in any of the parties' interests--either the Department of Justice's interest in competition, or the Bell System's interest in maximizing its aggregate value.
 
 
 54
 The majority assumes that just because the Department of Justice and AT & T are parties to the same contract, and both have interests in the line-of-business restrictions (one acting for the public, the other for its shareholders), it follows that they must have identical rights in relation to those restrictions. It is clear, however, that in multiple-party contracts not every party will necessarily have a right to enforce every duty of every other party; lines of entitlement may be single, not multiple. The general point about separate right-duty relations typically arises in a slightly different context, with a single obligee claiming that multiple obligors' duties are joint, so that it may enforce all its rights against either. In that context, courts do not create the kind of duty sprawl that the majority indulges here; the rights and obligations of each party may be several as well as joint, to whatever extent the parties intend. See Restatement (Second) of Contracts §§ 10, 288 & comment d (1981) ("if one party promises one performance, and another promises a different performance, each may be bound independently of the other and the promisee may be entitled to both performances"); 4 Corbin, Contracts §§ 926, 940 (1951). Compare Over the Road Drivers, Inc. v. Transport Ins. Co., 637 F.2d 816 (1st Cir.1980), which held that an insurer could not offset its debt to one of several insureds under a single policy by moneys owed to it by the other insureds. Even though there was a single policy and the insureds were closely related, the court found their rights and obligations distinct. It would follow that if one of the insureds had wanted to modify its obligations under the contract, the others would have no power to convert such an uncontested modification to a contested one (governed by Swift if the agreement were a consent decree)--even if in some way these others would be incidentally injured by the modification (for example, if the modification would turn the insured that sought it into more of a competitive threat to the others). More generally, if various obligors (AT & T and the BOCs) are bound independently to one or more obligees (the Department of Justice, as well as each other), even in a single contract, each obligation runs only to those whom it was intended directly to benefit (and similarly the right to seek or oppose a modification of an obligation). An obligation will not run automatically to every party that might incidentally derive a benefit.
 
 
 55
 To the extent that the text and structure leave doubt, we should turn to "contemporaneous statements of [the decree's] objectives". Triennial Review, 900 F.2d at 306 (citations omitted). In fact, Bell expressed only hostility to the restrictions. Counsel for the Bell System told the district court prior to approval of the decree that the Bell System was "against restrictions" on the BOCs, and that it agreed to them only "because Justice required it as a part of the bargain." Joint Appendix ("J.A.") 181-82; see also American Tel. & Tel. Co., 552 F.Supp. at 186 n. 227. Bell also told the FCC that the restrictions were not "our idea. We'd be happy to have [the BOCs] unrestricted". See J.A. at 126-27. The statements that AT & T throws against these, and which the majority says demonstrate "more affirmative interest in the prohibitions", Maj.Op. at 1239, are quite weak. In one set of comments to the district court Bell affirmed its commitment to the restrictions, but "as part of its overall bargain for the Decree", J.A. at 145, stressing that the Department of Justice promised periodic reviews, id. at 146. AT & T points to one filing with the court in which Bell defended the decree against the contention that the BOCs would not be viable. Id. at 166-77. But this defense came right after a statement that Bell "has acknowledged the importance of [the] restrictions to the Justice Department's theory of this Decree.... [This] discussion[ ] will not be repeated here." Id. at 166. That Bell signed and defended the Decree, in the [297 U.S.App.D.C. 247] interest of avoiding the costs and risks of litigation, does not mean that it desired the restrictions, or even that it thought they mitigated the break-up. The contemporaneous evidence shows, on the contrary, that Bell was at least ambivalent and probably hostile to the restrictions.
 
 
 56
 The contract language, and the structure and history of the negotiation, do not support an inference that every one of the parties was given the right to obtain, through opposition to a change, application of the VIII(C) standard. That being so, we may search for default rules. The common law has addressed a cognate problem--whether those who acquire portions of a burdened estate may sue each other to enforce an equitable servitude benefiting a third party. The answer is no, unless the estate was subdivided pursuant to a common plan or scheme. See Korn v. Campbell, 192 N.Y. 490, 85 N.E. 687 (1908); American Law of Property § 9.34 (1952). Analogously, there is no reason to infer a power in AT & T (and each of the BOCs) to enforce the line-of-business restrictions. The policy in both cases is to deny strangers the legal means to interfere with each other's private affairs in the absence of a clear directive. More narrowly, by limiting the flow of the beneficial interest to successors of the original beneficiaries, it prevents the benefit from going to unintended parties; it thus enhances flexibility by allowing the obligor to secure changes through negotiation with a relatively narrow class of parties--only those with a genuine expectation or reliance interest.
 
 
 57
 More acutely relevant is the antitrust standing doctrine, which requires an antitrust plaintiff to allege an "antitrust injury", i.e., one "of the type the antitrust laws were designed to prevent and that flows from that which makes defendant's acts unlawful." Cargill, Inc. v. Monfort of Colorado, Inc., 479 U.S. 104, 113, 107 S.Ct. 484, 491, 93 L.Ed.2d 427 (1986) (quoting Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977)). Rushing in at the behest of one whose interest lies in diminished competition is likely to "chill the very conduct the antitrust laws are designed to protect". Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 594, 106 S.Ct. 1348, 1359-60, 89 L.Ed.2d 538 (1986) (addressing predatory pricing claims). If a BOC were really to reduce competition in interexchange services, so that output were restricted and price increased, AT & T as the largest carrier in that market would benefit, except to the extent that the business acquired by the entering BOC cut into AT & T's. AT & T's opposition is thus at least as easily chalked up to fear of enhanced competition as to any genuine concern for its reduction. Here, as in Cargill, AT & T is really objecting to a potentiality of later anticompetitive conduct, of misbehavior after entry rather than any antitrust injury that would flow from entry itself. To read the decree as assigning AT & T special rights against modifications of the line-of-business rules is to allow it just the sort of preemptive strike against competition that the Court rejected in Cargill.[2]
 
 
 58
 Of course the fact that the parties occupy adjacent fields does not mean in itself that one cannot have antitrust claims against conduct of the other, such as MCI's original "essential facilities" and predatory pricing claims against the Bell System. See MCI Communications Corp. v. American Tel. & Tel. Co., 708 F.2d 1081 (7th Cir.1983). Those are a far cry from the [297 U.S.App.D.C. 248] simple market division that AT & T seeks to enforce here. Compare Maj. Op. at 1240.
 
 
 59
 The majority insists that here the modification would cause AT & T a genuine antitrust injury: the BOCs "are expanding the boundaries of their monopolies to render a portion of the interexchange market completely non-competitive." Id. at 1240 n. 16. But in fact the BOCs propose only to change the means of implementing the monopolies granted to them by state law, shifting to more efficient ways for handing off signals generated in their region to the interexchange carriers.
 
 
 60
 The majority also argues that its holding is required by precedent. Id. at 1240-41. In Triennial Review and in United States v. Western Electric Co., 907 F.2d 1205 (D.C.Cir.1990) ("NYNEX Procurement"), this court applied (or directed the district court to apply) the Section VIII(C) standard to analyze decree modifications proposed by the BOCs and DOJ and resisted by AT & T. In neither case, however, was it argued that Section VII should apply to such modifications, cf. Maj. Op. at 1241 (chiding BOCs for failure to raise point in earlier litigation), and so in both cases the court assumed that Section VIII(C) applied without deciding the issue. The BOCs' reference on appeal in Triennial Review to AT & T's lack of opposition to the modification of the information services ban did not "clearly focus[ ]" the court on the issue, cf. Maj. Op. at 1241, as no party was arguing that this lack of opposition foreclosed application of Section VIII(C). It may be that "but for AT & T's opposition, we would have reversed and remanded the manufacturing portion of Triennial [for application of Section VII] just as we did the information services portion", Maj. Op. at 1241 (emphasis in original), but that assumes we would have seized upon an unraised issue. Cf. Independent Ins. Agents of America v. Clarke, 955 F.2d 731, 741-44 (D.C.Cir.1992) (dissent).
 
 
 61
 * * *
 
 
 62
 As the majority explains, the public interest standard--the common law standard for unopposed modifications of consent decrees--is quite relaxed. The proposed modification need only be "within the zone of settlements consonant with the public interest today." See Triennial Review, 900 F.2d at 307 (emphasis in original). Because the district court has not yet applied the correct standard, and because we sit as a court of review, I would remand the case to the district court for application of the proper standard for uncontested modifications.
 
 
 
 [1]
 Because the Companies and the United States each seek reversal of the judgment below, we refer to them together as "appellants," although the government is technically an appellee
 
 
 [2]
 The seven BOCs--Ameritech, Bell Atlantic Corp., BellSouth Corp., NYNEX Corp., Pacific Telesis Group, Southwestern Bell Corp., and U S WEST, Inc.--are independent Regional Holding Companies, each controlling several of the Bell System's 22 local operating companies. The Companies are also known as the "RBOCs," "RHCs," or "Baby Bells."
 
 
 [3]
 The full text of the consent decree, formally entitled the Modification of Final Judgment, appears in the Decree Opinion. See 552 F.Supp. at 226-32
 
 
 [4]
 Section IV(F) states, in relevant part:
 "Exchange access" means the provision of exchange services for the purpose of originating or terminating interexchange telecommunications. Exchange access services include any activity or function performed by a BOC in connection with the origination or termination of interexchange telecommunications, including but not limited to, the provision of network control signalling.... Such services shall be provided by facilities in an exchange area for the transmission, switching, or routing, within the exchange area, of interexchange traffic originating or terminating within the exchange area, and shall include switching traffic within the exchange area above the end office and delivery and receipt of such traffic at a point or points within an exchange area designated by an interexchange carrier for the connection of its facilities with those of the BOC.
 
 
 [5]
 That the decree permits the Companies to use centralized STP pairs to support their own intra-LATA services is not in dispute. STPs are deployed in pairs to provide greater reliability. The paired STPs need not be in the same location
 
 
 [6]
 Section VII states that:
 Jurisdiction is retained by this Court for the purpose of enabling any of the parties to this [decree], or, after the reorganization specified in section I, a BOC to apply to this Court at any time for such further orders or directions as may be necessary or appropriate for the construction or carrying out of this [decree], for the modification of any of the provisions hereof, for the enforcement of compliance herewith, and for the punishment of any violation hereof.
 
 
 [7]
 By contrast, changes opposed by a decree party--at least when that party is the United States, see Triennial Review Opinion, 900 F.2d at 294 n. 12--may be denied unless there is " 'a clear showing of grievous wrong evoked by new and unforeseen conditions.' " Id. at 305 (quoting United States v. Swift & Co., 286 U.S. 106, 119, 52 S.Ct. 460, 464, 76 L.Ed. 999 (1932)). But cf. Rufo v. Inmates of Suffolk County Jail, --- U.S. ----, 112 S.Ct. 748, 116 L.Ed.2d 867 (1992) (suggesting a more lenient reading of Swift )
 
 
 [8]
 The BOCs also sought a declaratory judgment that the decree allows them to use centralized CCS interfaces. The government opposed that portion of the motions, the district court flatly denied it, and the Companies have not pursued it on appeal
 
 
 [9]
 Section VIII(C) states in full:
 The restrictions imposed upon the separated BOCs by virtue of section II(D) shall be removed upon a showing by the petitioning BOC that there is no substantial possibility that it could use its monopoly power to impede competition in the market it seeks to enter.
 
 
 [10]
 Section VIII(C) was added because of a concern that otherwise contested line-of-business modifications would be governed by the stringent Swift "unforeseen conditions" test, see supra note 7, preventing pro-competitive changes in response to new but foreseeable market conditions. See Triennial Review Opinion, 900 F.2d at 291; Decree Opinion, 552 F.Supp. at 194-95 & n. 266
 
 
 [11]
 At oral argument, counsel for the BOCs did not press the claim that centralization of signaling interfaces would not violate the section II(D)(1) restriction at all because the Companies would not transmit "end user communications" across LATA boundaries. Indeed, the Companies propose to transmit signaling information between points in different LATAs for a price (the access charge), and that would appear to make the proposed service "interexchange telecommunications" and "telecommunications service" as defined in sections IV(K) and (P) of the decree. See United States v. Western Elec. Co., 907 F.2d 160, 163-64 (D.C.Cir.1990) (Gateway Opinion ) (discussing interpretation of section II(D)(1)), cert. denied, --- U.S. ----, 111 S.Ct. 1018, 112 L.Ed.2d 1100 (1991); see also Reconsideration Opinion, Mem. at 1-2 ("[T]he transport of signaling messages over LATA boundaries is an interexchange function...."); Waiver Opinion, 131 F.R.D. at 650 (same)
 
 
 [12]
 Section III provides in relevant part (with emphasis added):
 The provisions of this [decree] applicable to each defendant and each BOC, shall be binding upon said defendants and BOCs, their affiliates, successors and assigns,....
 The dissent makes the interesting point that under our reading of the decree, a BOC would be able to contest another BOCs' effort to relax a line-of-business restriction. See Dissent at 5. That may seem an unlikely occurrence today, but, in any event, we see no reason why that would necessarily be thought undesirable. We will await a concrete case, however, to say any more on that scenario.
 
 
 [13]
 Section VIII(G), which Judge Williams reads as establishing a "clear entitlement[ ]" for AT & T to move for judicial resolution, Dissent at 1244, speaks of actions by "a party or a BOC"--virtually mirroring the "any of the parties ... [or] a BOC" language of section VII
 
 
 [14]
 Missouri-Kansas Pipe Line Co. v. United States, 312 U.S. 502, 61 S.Ct. 666, 85 L.Ed. 975 (1941), upon which the BOCs rely, seems if anything to cut against their position. There the Supreme Court reversed in relevant part a district court opinion approving a proposed antitrust decree modification (apparently under the public interest test; the decree contained no provision like section VIII(C)) with instructions to "adjust the right which belongs to Panhandle with full regard to that public interest which underlay the original suit." Id. at 509, 61 S.Ct. at 669 (emphasis added). Panhandle's opposition to the change was not, therefore, considered irrelevant--as appellants would have us consider AT & T's--even though Panhandle was merely an intervenor whose rights under the decree were expressly limited
 
 
 [15]
 Even were we to determine that AT & T must assert a cognizable and unique interest (vis-a-vis other interexchange carriers) in the CCS waiver in order to be entitled to put the BOCs to their proof under section VIII(C), it appears that AT & T would qualify. Pursuant to the reorganization plan implementing the decree, the Bell System's widespread signaling facilities were allocated to AT & T; these assets would be devalued--and therefore AT & T's "rights," narrowly expressed, would be infringed--if the BOCs could provide signaling on a centralized basis so that other interexchange carriers were spared the costs of investing in such far-flung facilities. As we have indicated, however, we do not think such a particular examination of AT & T's rights and interests is called for under the decree in order to conclude that AT & T has every right to force a section VIII(C) examination of the CCS proposal
 
 
 [16]
 Of course, in this case, as we discuss further below, the BOCs are not just entering a competitive market, they are expanding the boundaries of their monopolies to render a portion of the interexchange market apparently non-competitive. See infra page 1242
 
 
 [17]
 It is therefore again unnecessary to decide what standard would govern a contested modification proposal, filed under section VII and either brought by or supported by the government, that does not implicate section II(D). See Triennial Review Opinion, 900 F.2d at 294 n. 12
 
 
 [18]
 We do not foreclose reexamination of the market definition in future cases, however. It may be that there are relevant submarkets or a developing signaling market, although none has been identified thus far
 
 
 [19]
 Access charge regulation is also relevant to the concern that a BOC foothold in the interexchange market would create an incentive for exchange access discrimination against certain interexchange carriers. See Waiver Opinion, 131 F.R.D. at 651. The uncertain effectiveness of existing regulation was a principal reason for our denying the Companies' full-fledged entry into the interexchange services market in the Triennial Review case. See 900 F.2d at 300-01
 
 
 [20]
 The district court discounted the significance of the savings. See Waiver Opinion, 131 F.R.D. at 650 & n. 7. And intervening developments appear to support the view that installing STP pairs in every LATA is not cost-prohibitive (if perhaps not most cost-efficient). These include the Companies' ongoing deployment of additional STP pairs and the FCC's recent order effectively requiring the Companies to provide CCS interconnection in virtually every LATA by April 1993 to allow "portability" of 800 numbers, see Provision of Access for 800 Service (CC Docket No. 86-10), FCC 91-249 (released Sept. 4, 1991)
 
 
 [1]
 By contrast, the decree in Missouri-Kansas Pipe Line Co. v. United States, 312 U.S. 502, 61 S.Ct. 666, 85 L.Ed. 975 (1914), "explicitly reserved certain rights" to Panhandle, id. at 504, 61 S.Ct. at 667, and these were the rights that Panhandle sought to vindicate in court, see id. at 509, 61 S.Ct. at 669. Thus the case is not relevant. Cf. Maj.Op. at 1239 n. 14
 
 
 [2]
 The parties and this court seem to have assumed all along that AT & T has standing to challenge modifications in the line-of-business restrictions. Given its clear commercial interest, there seems little doubt that the Constitutional minimum is satisfied. See Warth v. Seldin, 422 U.S. 490, 498-502, 95 S.Ct. 2197, 2204-07, 45 L.Ed.2d 343 (1975). As the Tunney Act gives the district judge a great deal of discretion when making a public interest determination to include various entities as parties, intervenors, amici, or any other kind of participant, 15 U.S.C. § 16(f)(3), prudential standing is also present. But to say that AT & T has standing to sue is not the same as saying that it has the power, by its opposition, to change the standard for approval of a modification